WISCONSIN'S ENVIRONMENTAL DECADE, INC., Utility Consumers United, United Auto Workers—Region 10, Citizens for a Better Environment, Inc., Wisconsin Ecological Society, Senator David G. Berger, Senator Warren D. Braun, and Representative Michael Kirby, Appellants,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent.†

Court of Appeals

*No. 79–792. Argued April 21, 1980.—*
*Decided September 9, 1980.*
(Also reported in 298 N.W.2d 205.)

† Petition to review denied.

For the appellant there were briefs and oral argument by *Kathleen M. Falk* of Madison.

For the respondent, Wisconsin Electric Power Company, there was a brief by *Quarles & Brady*, of Milwaukee, and oral argument by *Larry J. Martin*.

For the respondent, Public Service Commission of Wisconsin, there was oral argument by *Steven M. Schur*, chief counsel, with whom on the briefs were *Bronson C.*

*La Follette,* attorney general, and *Thomas A. Lockyear,* assistant chief counsel.

Before Donlin, P.J., Foley, J., and Dean, J.

DEAN, J.   Wisconsin's Environmental Decade (WED) appeals from a judgment affirming in part an order of the Public Service Commission (PSC) modifying the rate design and authorizing an increase in rates of the Wisconsin Electric Power Company (WEPCO). The trial court determined that the PSC prepared an adequate Environmental Impact Statement (EIS) before authorizing the change in rate structure. The trial court also determined that the rate increase was reasonable, except for a relatively small amount that was to be used to cover expenses for advertising. For reasons set forth below, we affirm the decision of the trial court.

The EIS in this case was prepared to assess the environmental impact of a change in rate design and an increase in rates. WED's major criticism is that the EIS fails to adequately disclose the impact and discuss the alternatives to the change in rate design. The PSC's order changed WEPCO's rate design in two ways. It established time-of-day rates for its larger customers and for certain small and industrial customers, and it established seasonal rates for its major classes of customers.

The purpose of these rate design changes was to encourage some customers to shift their electric power demands to different times when the cost of producing electric power is lower. The cost of producing electric power differs because the maximum possible demand for electricity is not constant. Only during certain hours does the demand for electricity reach WEPCO's maximum capacity to produce it. These peak demand periods also vary with the season, with summer producing greater peak demand periods. Since these peak demand

periods vary, it is not necessary to have all of WEPCO's generating capacity operating at all times. Accordingly, WEPCO supplies the bulk of its electricity through base load plants, which produce electricity at the lowest operating cost per unit. When the demand for electricity exceeds the capacity of the base load plants, WEPCO produces electricity from its intermediate plants. When the demand for electricity reaches its peak, WEPCO generates electricity from oil-fired "peaker" plants. These plants have the highest operating cost per unit. The goal of the differential rate designs is to minimize the use of the "peaker" plants by shifting demand to off-peak periods.

WED contends that several adverse environmental and social impacts could develop as a result of the use of time-of-day and seasonal rate differentials. WED contends that the new rate designs have a strong potential for being energy promotional because lower off-peak rates might encourage the use of electricity for space heating in the winter; encourage the development of electric cars; and encourage potential users to switch from alternate fuels to electricity. Therefore, according to WED, the differential rates might encourage the development of new peak periods at different times instead of reducing peak periods.

WED also contends that time differential rates are unlikely to have a significant effect on reducing actual peak demands because peak demands are considered to be more inelastic than demands at other times. By way of example, WED argues that there are certain peak periods, such as when the temperature is ninety-eight degrees, when customers will use their air conditioners no matter what the differential is in price. Therefore, according to WED, although differential rates may flatten the difference in day/night demands, they will do

nothing to eliminate those inelastic peak periods called "needle peaks."

WED next contends that the implementation of time differential rates will discourage the implementation of an alternative method of electric energy conservation called load management, which is the direct control by the utility of various customer uses. WED argues that this will happen because each conservation strategy entails its own metering and other costs so as to make it uneconomical to place both on the same customer, and also because the pricing incentives used to encourage the use of one method of reducing peak demand will reduce the amount of remaining price incentive to encourage the use of the other method.

Finally, WED argues that time differential rates may have an adverse effect on workers and their families because factories will be encouraged to change to night shifts to take advantage of the low off-peak rates. WED contends that the preparation of an adequate EIS was of particular importance so as to warn of, and perhaps ameliorate, these alleged adverse impacts.

## ADEQUACY OF THE EIS

The Wisconsin Environmental Protection Act (WEPA), sec. 1.11(2) (c) 1–6, Stats., requires the preparation of an EIS that discusses:

1. The environmental impact of the proposed action;
2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;
3. Alternatives to the proposed action;
4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

The purpose of an EIS is to enable an agency to take a "hard look" at the environmental consequences of its proposed action. *New York, Natural Resources Defense Council, Inc. v. Kleppe,* 429 U.S. 1307 (1976). The duty of an agency to prepare an EIS does not require it to engage in remote and speculative analysis. *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc.,* 435 U.S. 519 (1978). Instead, the statute must be construed in the light of reason. *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827 (D.C. Cir. 1972).

In this case, the PSC discussed the issues and alternatives raised by WED. WED, however, claims that this discussion was inadequate. WED objects to the fact that the PSC did not use certain methodologies suggested by it to analyze whether the rate differential would be energy promotional and whether it would, in fact, reduce needle peaking. WED also contends that the EIS did not adequately explore the potential negative impacts on workers and their families and the alternative of load management. Finally, WED contends that the EIS did not adequately address the general environmental impacts resulting from the changed rate structure.

Initially, there is disagreement between the parties as to the proper standard of review a court must use in reviewing an agency determination that an EIS was adequately prepared according to the dictates of WEPA. The PSC contends that the proper standard of review is that set forth in sec. 227.20, Stats., of the Wisconsin Administrative Procedure Act of 1946, which provides in part:

(6) If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

. . . .

(8) The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; or is otherwise in violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion.

. . . .

(10) Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it. The right of the appellant to challenge the constitutionality of any act or of its application to the appellant shall not be foreclosed or impaired by the fact that the appellant has applied for or holds a license, permit or privilege under such act.

WED, on the other hand, contends that a higher standard of review is required. WED contends that a reviewing court should use a rigorous test of reasonableness where a court will look to see if an agency gave a "hard look" at the environmental consequences of a proposed action. According to WED, if such a standard is applied, a reviewing court will not defer to the knowledge and expertise of the agency.

The basis for WED's contention that a more rigorous standard of review is required is found in *Wisconsin's Environmental Decade, Inc. v. PSC*, 79 Wis.2d 409, 256 N.W.2d 149 (1977). In that case, the court held that a

test of reasonableness would be applied in reviewing an agency's threshold decision that it was not necessary to prepare an EIS. WED acknowledges that an EIS was prepared in this case, but it contends that the same standard of review should be applied.

We cannot find any support for the proposition that the statutory procedures of administrative review should be ignored in favor of a judicial extension of the power of a court to review an agency's determination. Although *Wisconsin's Environmental Decade, supra,* discussed federal cases holding that an agency's decision not to prepare an EIS will be given no particular deference, since the matter is not one of administrative discretion, the actual holding of the case was:

> We therefore conclude that the questions by which the agency decision was to be tested in the case at bar were these: First, has the agency developed a reviewable record reflecting a preliminary factual investigation covering the relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the action proposed; second, *giving due regard to the agency's expertise where it appears actually to have been applied,* does the agency's determination that the action is not a major action significantly affecting the quality of the human environment follow from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations? *Wisconsin's Environmental Decade, supra,* at 424–25, 256 N.W.2d at 158 [Emphasis supplied.] [Footnote omitted.]

It thus appears as if there is little difference, if any, between the test of reasonableness set forth in *Wisconsin's Environmental Decade, supra,* and the standard of review set forth in sec. 227.20.[1]

---

[1] It must be remembered that the issue in *Wisconsin's Environmental Decade, Inc. v. PSC,* 79 Wis.2d 409, 256 N.W.2d 149 (1977), was whether an impact statement even had to be filed in the first

■

In addition, the United States Supreme Court has held that the National Environmental Policy Act of 1969 (NEPA) does not alter the similar federal standard for review of administrative decisions:

We accordingly remand so that the Court of Appeals may review the rule as the Administrative Procedure Act provides. We have made it abundantly clear before that when there is a contemporaneous explanation of the agency decision, the validity of that action must "stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review." . . . The court should engage in this kind of review and not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are "best" or most likely to further some vague, undefined public good. *Vermont Yankee Nuclear Power, supra,* at 549 [citations and footnote omitted].

Since WEPA is substantially patterned after NEPA, the Wisconsin Supreme Court has held that federal case interpretation of NEPA is persuasive authority for the interpretation of WEPA. *See Wisconsin's Environmental Decade, Inc. v. PSC,* 69 Wis.2d 1, 230 N.W.2d 243 (1975). We therefore conclude that the appropriate standard of review should be that set forth in sec. 227.20.

■

On appeal from a decision of an administrative agency, a reviewing court must accept findings of the agency if they can be supported by substantial evidence. Section 227.20 (6), Stats. Substantial evidence does not mean the preponderance of evidence, but rather whether reasonable minds could reach the same conclusion reached by

---

place. Here, an impact statement was filed. We acknowledge that in some cases, an EIS may so completely fail to comport with the dictates of the WEPA as to be virtually in the same class as a negative threshold decision.

the agency. *Town of Ashwaubenon v. State Highway Commission,* 17 Wis.2d 120, 115 N.W.2d 498 (1962). Due weight must be given a particular agency's competence and expertise, sec. 227.20(10), and a reviewing court should not substitute its judgment for an agency's application of a particular statute to the found facts if a rational basis exists for the agency's interpretation and that interpretation does not conflict with the legislative history of the statute, prior case law, or constitutional prohibitions. *Pabst v. Wisconsin Department of Taxation,* 19 Wis.2d 313, 120 N.W.2d 77 (1963).

The EIS in this case did not quantify the energy promotional potential resulting from the rate differential because the PSC concluded that no adequate methodology existed to make a meaningful analysis of the problem. WED contends that the PSC should have used a methodology called the "engineering approach" suggested by one of its expert witnesses.

The basis of the engineering approach is the collection of data regarding actual and predicted end uses for electricity. WED's witness suggested that numerous state and federal agencies, corporations, and associations be consulted to obtain this information. The gathering and analysis of this massive amount of information, however, with its attendant costs and delays, would only provide a data base from which estimates could be drawn. There is nothing in the record to indicate that these estimates would be any more accurate than those resulting from the use of the econometric approach, which the PSC found to be inadequate. Both approaches attempt to measure customer response to a change in price. The econometric approach tries to measure direct consumer response, whereas the engineering approach tries to measure the number and types of appliances in use after a change in price. Both approaches involve

■

guesswork, however, and WED's witness admitted that both approaches are similar in some ways. We cannot conclude that the agency's conclusion regarding the lack of adequate methodologies was unreasonable.

WED also contends that the EIS was inadequate because it failed to "meaningfully evaluate the inability of time-differentiated rates to reduce system peak demand." This contention focuses on the needle-peaking phenomenon discussed earlier. According to WED, a meaningful evaluation would include the use of a study called the Atkinson study.

■

The EIS included discussion of the Atkinson study, but it was not used to quantify the effect of differential rates on peak demand because the PSC found that its results were inconsistent and also concluded that the design of the experiment was suspect. WED has presented no information to contradict the PSC's determination, but instead its argument seemed to be that the use of the study is better than nothing. If the Atkinson study is indeed unreliable, however, then its use would not only provide inaccurate information, but would also be misleading. We cannot conclude that the PSC's determination is not supported by substantial evidence or is unreasonable.

The EIS also discussed the possibility that time differential rates may have a negative impact on workers because factories might be encouraged to operate at night to take advantage of off-peak rates. Again, the EIS did not quantify this information, and consequently WED contends that this discussion is inadequate.

■

As evidenced by the above discussion, however, the record indicates that the ability to predict consumer response to various rates is highly speculative. Even if

the PSC had consulted the wide variety of sociological, psychological, and law enforcement sources and had examined the health data recommended by WED's expert witness, there is nothing in the record to indicate that any accurate predictions could be made. While the qualitative discussion set forth in the EIS may not have been exhaustive, we cannot conclude that it was inadequate.

WED next contends that the EIS did not adequately discuss alternatives to time-of-day rates or the extent to which those alternatives are impeded by the adoption of time-of-day rates. The record, however, indicates that the EIS extensively discussed alternatives to the rate differential proposals. Moreover, the final order shows that the PSC considers load management to be a complement to time-differential rate making. The PSC stated that it is currently encouraging load management in two other proceedings and has authorized the purchase of 150,000 load control units. On the basis of hindsight, load management might prove to be a more effective method of energy conservation. For the time being, however, the PSC has elected to proceed with rate differential techniques as a means of energy conservation. This is a matter of agency discretion, sec. 227.20 (8), and this court cannot conclude that the choice of this technique rather than some other technique is an abuse of agency discretion.

Finally, WED contends that the EIS does not adequately discuss the general environmental impacts resulting from the change in rate structure. WED contends that the EIS should have discussed the impacts arising from increased generation and transmission of electric power. As indicated earlier, however, no adequate method currently exists to predict whether the changed rate structure will result in increased generation and transmission of electric power. Therefore, any discussion

of negative impacts arising from an increase would be speculative and premature.

RATE INCREASE ISSUES

The final order of the PSC allowed WEPCO to increase its rates so that it could continue to receive a reasonable rate of return. WEPCO's authorized rate of return remained constant but, because of increased expenses, a rate increase was necessary. In setting a new rate level, the PSC scrutinized WEPCO's operating statement so that it could calculate the amount of revenue necessary to provide the authorized rate of return. WED, on appeal, challenges two items in WEPCO's operating statement.

WED first challenges the inclusion of $245,000 in the operating statement for WEPCO's contribution to the Atomic Energy Commission's Clinch River experimental liquid metal fast breeder reactor project. WED contends that this amount should not have been considered without the prior preparation of an EIS on the project.

In dealing with a negative threshold decision, we are bound by the standard of reasonableness. *Wisconsin's Environmental Decade,* 79 Wis.2d 409, 256 N.W.2d 149 (1977). Viewed under this standard, we agree with the trial court's conclusion that the preparation of an EIS for this federal project on the basis of an expense item in the operating statement would be "unreasonable under any test."

The Clinch River project is a federal program for which a federal EIS has already been required. *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079 (D.C. Cir. 1973). Moreover, WEPCO's contribution is only a minute portion of the $2 billion estimated costs of the project. *Scientists' Institute, supra.* If an EIS were required by

every contributor to the project, in addition to the required federal EIS, the result would be an enormous duplication of effort as well as cost.

In addition, we are impressed with WEPCO's argument that WEPA requires a hard look only at the environmental consequences of an agency's proposed action.[2] Here, the proposed action is merely the determination of rates, and an EIS is not required to examine the impacts of all of WEPCO's expenditures. An EIS does not have to be prepared to examine the effects of strip mining because WEPCO's expenses include the purchase of coal; nor is an EIS required to examine the effects of refinery construction because WEPCO's expenses include the purchase of oil where an EIS was prepared for the initial operation.

WED also challenges the inclusion of $576,000 in the operating statement, which represents the amortized portion of an extraordinary loss caused by a severe ice storm in 1976. WED contends that allowing recovery from present ratepayers for a loss occurring in a prior year amounts to retroactive rate making, which is prohibited by sec. 196.37, Stats., and provides in part:

(1) Whenever upon an investigation . . . the commission shall find rates . . . to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise unreasonable or unlawful, the commission shall determine and by order fix reasonable rates . . . to be imposed, observed and followed *in the future* in lieu of

---

[2] It is WED's impression that WEPCO is asserting that there is no "state action" involved here for WEPA purposes. As we understand WEPCO's argument, WEPCO is not raising a "state action" issue, but instead is merely saying that an EIS does not require a discussion of tangential matters remotely connected with an agency's proposed action.

those found to be unreasonable or unlawful. [Emphasis supplied.]

The supreme court has held that without statutory authority, rates are to be applied prospectively. *Friends of the Earth v. PSC*, 78 Wis.2d 388, 254 N.W.2d 299 (1977). In the case of *Wisconsin Telephone Co. v. PSC*, 232 Wis. 274, 303, 287 N.W. 122, 137 (1939), the court held that "in establishing a rate for the future and in the absence of statutory authorization therefor, the commission may not amortize a loss or make a rate sufficiently low to recapture the excesses." We cannot conclude, however, that the prohibition against retroactive rate making applies in the recouping of an extraordinary casualty loss.

It is clear that the proscription against retroactive rate making applies to prevent a company from recouping losses caused by errors in judgment or through company mismanagement. Without this rule, there would be no incentive for efficient management. The supreme court has recognized though that there may be some instances where it is proper to recoup past losses. The case of *Town of Milton v. Railroad Commission*, 185 Wis. 294, 295, 201 N.W. 381, 382 (1924), dealt with a situation where a utility's equipment was rendered obsolete because an improved method of providing power was introduced into the service area. The supreme court noted that it was impractical to immediately recoup its loss by increased rates and held: "We think there can be no doubt that the public utility had a right to recoup its loss through its rates over a period of time. The machinery and equipment were prudently purchased and prudently used at the time, but became uneconomical because of changed conditions." While *Milton* dealt with the valuation of the company, whereas here the issue is rate mak-

ing, we think the principles involved are essentially the same.

It is true, as WED says, that WEPCO did not insure its property or set up a storm damage reserve, but the record is clear that WEPCO was not allowed to take these measures. As the final order of the PSC notes, the method of recovery used here "results in the lowest overall cost to the consumer."

WED has not alleged that the consideration of this extraordinary casualty loss will result in rates that are unjust or unreasonable. In fact, if the storm damage were not considered by the PSC, the result would be an unjust and unreasonable loss to WEPCO.

## ADEQUACY OF THE PSC'S ORDER

WED's final contention is that the PSC's order fails to adequately give the reasons for several of its decisions. WED challenges the PSC's determination as to an appropriate level of customer cost allocation, which is a fixed charge representing the cost of connecting and maintaining a customer on the system regardless of whether he uses any electricity. WED contends that the method for applying this fixed charge has a potential for energy promotion since a large customer can spread the fixed charge over a greater number of kilowatt-hours. Therefore, the actual cost per unit of electricity would be slightly less for a large customer. WED also challenges the off-season charge, alleging that the lower rate could promote greater winter electricity usage than would otherwise be the case. Finally, WED contends that the PSC did not give reasons for its implicit rejection of WED's proposals for a temperature-sensitive rate in which the rate varies with the temperature to promote conservation on hot summer days.

It has long been the law that an agency must state the reasons for its decisions. *Transport Oil, Inc. v. Cummings,* 54 Wis.2d 256, 195 N.W.2d 649 (1972). Section 227.10 has codified this requirement and provides:

Every proposed or final decision of an agency or hearing examiner following a hearing and every final decision of an agency shall be in writing accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise and separate statement of the ultimate conclusions upon each material issue of fact without recital of evidence.

There is no requirement, however, that the agency provide an elaborate opinion. It is sufficient if the findings of fact and conclusions of law are specific enough to inform the parties and the courts on appeal of the basis of the decision. *State ex rel. Harris v. Annuity and Pension Board,* 87 Wis.2d 646, 275 N.W.2d 668 (1979).

In this case, the PSC explained in its interim order how it arrived at its levels for customer cost allocation. Moreover, the Commission explained its rationale for changing to a differential rate system, which includes the use of seasonal off-peak rates. Although the customer cost allocation and differential figures adopted by the PSC were different than those proposed by WED, the method of rate design used is an area in which the agency has wide discretion in determining the factors upon which it may base its precise rate schedule. *City of West Allis v. PSC,* 42 Wis.2d 569, 167 N.W.2d 401 (1969). The record shows that the methods for computing precise cost allocation and differential figures are complex, and this court cannot say that the PSC abused its discretion in choosing one figure over another. Section 227.20(8), Stats. The record is clear that the PSC adequately explained the basis for its decision, and we

conclude that an agency has no duty to justify the rejection of figures or methods urged by other interested parties.

For the same reason, we cannot conclude that the PSC was required to give reasons for its implied rejection of WED's proposal of a temperature-sensitive rate structure. The burden would simply be too onerous if an agency would be required to substantiate its reasons for not adopting all alternatives urged on it. Moreover, the record shows that temperature-sensitive rates were examined in the EIS. There, the PSC found that this pricing method requires sophisticated and expensive metering devices and concluded that there would be some question as to whether customers, especially residential customers, could properly react to temperature-sensitive rates. Consequently, it is inaccurate to say that this alternative was not considered at all.

*By the Court.*—Judgment affirmed.