WISCONSIN POWER & LIGHT COMPANY, Petitioner-Respondent,

WISCONSIN PUBLIC SERVICE CORPORATION, Intervenor-Respondent,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Appellant,

VULCAN MATERIALS COMPANY, Berlin Foundry Corporation, General Motors Corporation, Enzyme Bio-Systems, 3M Company, Georgia-Pacific Corporation, and Penda Corporation (collectively the Wisconsin Industrial Energy Group and WIEG), Intervenors-Appellants.†

Court of Appeals

*No. 91–1096. Oral argument May 7, 1992.—Decided October 1, 1992.*

(Also reported in 492 N.W.2d 159.)

† Petition to review granted.

For the respondent-appellant the cause was orally argued and submitted on the briefs of *Barbara E. James* of *Public Service Commission* of Madison.

For the intervenors-appellants the cause was submitted on the briefs of *Michael G. Stuart, Jon C. Nordenberg* and *Anita T. Callucci* of *Boardman, Suhr, Curry & Field,* Madison, and oral argument by *Michael G. Stuart.*

For the petitioner-respondent the cause was submitted on the briefs of *Barbara J. Swan* and *William D. Harvey* of Wisconsin *Power & Light Company,* Madison, and oral argument by *William D. Harvey.*

For the intervenor-respondent the cause was submitted on the briefs of *Allen W. Williams, Jr.,* and *Bradley D. Jackson* of *Foley & Lardner,* Milwaukee, and oral argument by *Bradley D. Jackson.*

Amicus curiae brief was filed by *Lee Cullen* of *Cullen, Weston, Pines & Bach,* Madison, for *Citizens Utility Board.*

Before Eich, C.J., Dykman and Sundby, JJ.

EICH, C.J. The Wisconsin Public Service Commission appeals from an order reversing its decision ordering the Wisconsin Power and Light Company (WPL) to pay a $9 million penalty and permanently excluding certain costs from its rate base.[1] The commission assessed the penalty upon a determination that WPL had "imprudent[ly] manage[d]" a coal-purchase contract. In a separate finding, the commission determined that WPL had failed to collect $494,777 in customer contributions in aid of construction of various distribution facilities and ordered an equivalent amount to be permanently excluded from the company's rate

---

[1]The Wisconsin Industrial Energy Group (WIEG) intervened in the appeal on the commission's side, and another electric utility, Wisconsin Public Service Corporation, intervened on the side of WPL.

base. On review, the circuit court reversed the commission in both respects.

The issues on appeal, then, are whether the penalty assessed by the commission against WPL constitutes impermissible retroactive rate making, and whether the commission properly excluded the construction costs from WPL's rate base.[2]

We agree with WPL that the penalty constitutes retroactive rate making. And while we are satisfied that the commission had the authority to reduce the company's rate base for its failure to collect the customer contributions, the commission has failed to establish a sufficient evidentiary basis for the $494,777 reduction. We therefore affirm the circuit court's order in all respects.

The facts are not in dispute. WPL entered into a long-term coal supply contract with the Western Energy Coal Company (WECO) in 1972. WECO agreed to provide coal for use in the Columbia Unit No. 1 Generating Station, which is operated by WPL but jointly owned by WPL, Madison Gas & Electric Company and the Wisconsin Public Service Corporation. The WECO contract was a cost-plus contract: the price of the coal was to be based upon, and fluctuate with, various cost components specified in the agreement.

In the years that followed, there were many price increases under the WECO contract, which WPL recouped through increases in the rates charged to its customers. Some of these rate increases resulted from "automatic" fuel adjustment clauses in WPL's filed rates, which allowed the utility to increase its customer rates, without commission examination or approval, as

---

[2]Given our holding, we need not address the other arguments raised by the parties. *Sweet v. Berge,* 113 Wis. 2d 61, 67, 334 N.W.2d 559, 562 (Ct. App. 1983).

its fuel costs rose.[3] In other instances, WPL's rate increases—based in part, at least, on its increased coal costs under the WECO contract—were the result of commission approval in formal rate cases. All in all, the commission approved WPL's rate increases—including the WECO cost adjustments—in fourteen separate orders issued between 1972 and 1988, determining each time that the rates the company was charging its customers were reasonable and allowing its contract coal costs to be included in those rates.

In 1985, as part of an assessment of the fuel purchasing practices of major Wisconsin utilities, the commission suggested to WPL that the price it was paying for coal under the WECO contract appeared to be high and that it should consider reviewing the contract. The company retained a consultant and undertook an internal audit of the contract, eventually concluding that the price it had been paying for WECO coal "ha[d] been unjustifiably escalated beyond the intent of the [c]ontract." The audit report suggested four alternative courses of action to remedy the problem. The suggestions ranged from suing to recoup past overpayments from WECO and renegotiating the contract through litigation, to simple adjustment of the contract price to be more competitive with the current market.

After reviewing the situation, WPL decided to renegotiate the WECO contract at a lower price; and it did so, reducing the price of coal under the contract from

---

[3]Fuel adjustment clauses allow a utility to automatically adjust rates as costs change without filing for a rate change with the commission, as is the usual procedure. The utility must pass both fuel increases and decreases on to its ratepayers through the fuel adjustment clause. In 1983, the legislature adopted sec. 196.20(4)(b), Stats., prohibiting the use of fuel adjustment clauses by electric public utilities.

$10.40 to $8.70 per ton. The new pricing system was made retroactive to January 1, 1988, and the "cost-plus" pricing provisions were replaced by an indexing system which, it was hoped, would be easier to administer in the future. WPL recovered none of the past overcharges and waived any claim to them. Finally, WPL renewed the (revised) WECO contract through 2004, an additional ten years beyond its original expiration date.

In a subsequent rate proceeding, the commission ruled that WPL had been imprudent in the administration of the WECO coal contract by either failing to catch overcharges by WECO or, once discovering the charges, neglecting to inform the commission and the co-owners of the Columbia Energy Center (where the overpriced coal was used) of them. The commission also determined that WPL had been similarly imprudent in deciding to waive WECO's past overcharges and renegotiate the coal contract, rather than choosing other, more severe, courses of action available to it. The commission assessed a $9 million penalty against WPL "as a result of its management's imprudence in administration of the [WECO] coal contract for the Columbia generating station." It ordered WPL to pay a portion of that amount as a refund to its ratepayers, and also to pay some $4 million of the total to two other utilities, Madison Gas & Electric Company and Wisconsin Public Service Corporation, who are co-owners of the Columbia Generating Plant, where the WECO coal was burned. On other matters in the rate case, the commission determined that WPL had built certain electric distribution facilities without collecting customer contributions as required by commission rules.[4] According to the commission, WPL

---

[4]The administrative rules governing extension of electric service require new or existing customers, whose electric demands necessitate the construction of new generation or transmission

had failed to collect some $494,777 from affected customers, and, that, as a result, its rate base was overstated in that amount. The commission ordered $494,777 to be "imputed and recorded as being provided by the utility," in effect permanently excluding that amount from WPL's rate base.

WPL sought judicial review, and the circuit court reversed, concluding that the penalty/refund provisions of the commission's order constituted improper retroactive rate making. The trial court grounded its decision on sec. 196.37(1), Stats., which provides that where the commission finds a utility's rates to be "unjust, unreasonable . . . or preferential or otherwise unreasonable or unlawful, the commission shall determine and order reasonable rates . . . to be imposed, observed and followed *in the future.*" (Emphasis added.) The court also reversed the commission's exclusion of $494,777 from WPL's rate base.

■■■■

Given the undisputed facts, whether the penalty ordered by the commission constitutes retroactive rate making under sec. 196.37, Stats., is a question of law. We apply varying degrees of deference to conclusions of law and interpretations of statutes in administrative agency decisions. In cases where the particular conclusion or interpretation invokes the agency's "experience, technical competence and specialized knowledge," we pay a high degree of deference, giving its decision "great weight." *Jicha v. DILHR,* 169 Wis. 2d 284, 291, 485 N.W.2d 256, 258–59 (1992). When the agency's decision is " 'very nearly' one of first impression," however, it is entitled to no more than "due weight." *Id.* at 291, 485

facilities, to pay a portion of the construction cost of these facilities. Wis. Adm. Code secs. PSC 113.80–97. These payments are called "contributions in aid of construction."

N.W.2d at 259. And, "where it is clear from the lack of agency precedent that the case is one of first impression for the agency," and where it does not appear that the agency has any "special expertise or experience in determining the question presented," its decision is entitled to no weight at all; we review it *de novo. Id.*

In this case, the commission's decision to order the refund—purportedly in the exercise of its general rate-making authority under ch. 196, Stats.—was based on its conclusion that WPL had been "imprudent" in administering the WECO contract; and that conclusion, in turn, appears to have been based on the commission's disagreement with the company's choice among the suggested alternatives—renegotiating the coal contracts rather than suing to recoup past losses. The latter was, obviously, the commission's choice, for it determined that the utility's managers had been "impruden[t]" for "fail[ing] . . . to pursue recoupment." And because the issue appears to be one of first impression in that there is nothing in the record to indicate that the commission has any special expertise or experience, aside from its general utility regulatory expertise, which would entitle its choice of remedies in this situation to special deference, we review its decision *de novo.*[5]

## Retroactive Rate Making

WPL argues first that the refund the commission ordered it to pay violates the prohibition against retroac-

---

[5]Even if we were to consider this to be not entirely a case of first impression, but only "very nearly" so, and thus accord due weight to the commission's decision, the result would be the same, for, as we explain below, we consider the penalty it imposed to constitute retroactive rate making and thus plainly beyond the statutory authority of the agency.

tive rate making and rate refunds contained in sec. 196.37, Stats. We agree.

■■■■■

As an agency created by the legislature, the commission "has only those powers which are expressly conferred or which are necessarily implied by the statutes under which it operates." *Kimberly-Clark Corp. v. Public Service Comm'n,* 110 Wis. 2d 455, 461-62, 329 N.W.2d 143, 146 (1983). And "[a]ny reasonable doubt as to the existence of an implied power in an agency should be resolved against the exercise of such authority." *Id.* at 462, 329 N.W.2d at 146.

It is well established that sec. 196.37(1), Stats., prohibits the commission from ordering refunds of rates collected by a utility under prior rate orders. *See Friends of the Earth v. Public Service Comm'n,* 78 Wis. 2d 388, 413, 254 N.W.2d 299, 309 (1977) (commission lacks authority to condition a final rate order upon a refund of any excesses in rates collected under previous orders); *Wisconsin Environmental Decade, Inc. v. Public Service Comm'n,* 98 Wis. 2d 682, 699, 298 N.W.2d 205, 212 (Ct. App. 1980) (utility rates may only be applied prospectively).

The supreme court has explained the rationale for this rule—that "[i]n fixing the rates to be charged by public utilities, the [commission] exercises an essentially legislative power, and . . . it is limited to fixing rates to be applied prospectively." *Friends of Earth,* 78 Wis. 2d at 411, 254 N.W.2d at 308 (citation omitted). The court has also stated "that the proscription against retroactive rate making . . . prevent[s] a company from recouping losses caused by errors in judgment or through company mismanagement," and that "[w]ithout this rule, there would be no incentive for efficient management." *Wisconsin*

*Environmental Decade,* 98 Wis. 2d at 699, 298 N.W.2d at 212.

■

We conclude, based on those cases, that the trial court correctly decided that the commission's order constituted impermissible retroactive rate making. As the supreme court stated in *Friends of Earth,* "[t]o permit the [commission] to condition a rate order on refund of sums collected under previously established permanent rates would directly violate the rule against retroactive rate making." 78 Wis. 2d at 412, 254 N.W.2d at 309.

The commission disagrees. It argues that the prohibition against retroactive rate making is not absolute, citing cases where certain accounting and rate-making practices involving some aspect of retroactivity have been upheld.

First, the commission asserts that "Wisconsin Courts have allowed recovery of the costs of extraordinary losses retroactively," citing *Wisconsin Environmental Decade.* We think the case is inapposite on this point. In *Wisconsin Environmental Decade,* the utility's operating statement included $576,000 representing the amortized portion of an extraordinary loss caused by a severe ice storm. We rejected a claim that allowing recovery from present ratepayers for such a loss constituted retroactive rate making, stating that while the prohibition against retroactive rate making "applies to prevent a company from recouping losses caused by errors in judgment or through company mismanagement," it did not apply to "the recouping of an . . . extraordinary loss" such as that caused by the ice storm. *Id.* at 699, 298 N.W.2d at 212. This case, obviously, concerns a penalty for purported mismanagement, not recovery for an extraordinary or unexpected loss.

The commission, pointing to *Wisconsin Public Service Corp. v. Public Service Comm'n,* 156 Wis. 2d 611, 620, 457 N.W.2d 502, 505 (Ct. App. 1990), also argues that "Wisconsin courts have recognized [the commission's] power to reduce a utility's rate of return on equity to reflect the costs of prior utility mismanagement." In that case, the commission ruled that the utility's management had been "imprudent" several years earlier when it failed to join other utilities who were challenging the constitutionality of the repeal of a tax credit. The utility had paid the disputed tax without protest, thus losing any opportunity for a refund if the constitutional challenge prevailed—which it did. As a "penalty" for such "imprudence," the commission's order set a rate of return on the utility's equity which was .1 percent less than otherwise would have been approved. The sanction cost the utility approximately $250,000 in lost revenue in the succeeding years, and we upheld the order.

Here, too, the commission's authority is distinguishable. In *Wisconsin Public Service,* the penalty was exacted in future rates; it was prospective, not retroactive, rate making. In this case the commission ordered a refund of rates paid under prior orders; and that we see that as retroactive rate making.

Finally, the commission points to fuel adjustment clauses as an example of allowable "retroactive rate making" in that they permit recovery of past increases in fuel costs from current rates. It is true, of course, that state law now prohibits electric utilities from employing fuel adjustment clauses. Even so, as in the *Wisconsin Public Service* case just discussed, fuel adjustment clauses simply permitted the utility to recover prior fuel cost increases in *future* rates. Their implementation did not, as does the penalty in this case, result in refunds of rates collected under prior commission orders.

564

We are satisfied that all of the "analogies" offered by the commission in support of its position are flawed because, as indicated, they concern future rates to be collected, rather than a refund of rates previously collected, as is the case here. As the supreme court unequivocally stated in *Friends of the Earth,* 78 Wis. 2d at 412, 254 N.W.2d at 309: "permit[ing] the [commission] to condition a rate order on refund of sums collected under previously established permanent rates would directly violate the rule against retroactive rate making."

What the commission attempts to do here is to impose sanctions on WPL for imprudent decisions made by its managers in the 1960's and 70's. But whatever mismanagement may have occurred at that time, the rates charged during those years—including rates increased by means of the automatic coal adjustment clause—were found to be reasonable and just and were specifically approved by the commission in more than a dozen separate rate cases during the years the WECO contract was in effect. All of the WECO charges were thus paid, and charged back to WPL's customers, pursuant to orders of the commission setting the company's rates. And we see no way around the cases holding that ordering refunds of such rates constitutes retroactive rate making.

We emphasize that the commission is not powerless to "penalize" a utility for poor or imprudent management, or to use its rate-setting powers to foster and encourage sound management on the part of utility managers. Indeed, it does this regularly—*Wisconsin Public Service, supra,* is an example—by authorizing future rates at a level lower than necessary to provide the full rate of return to the company's shareholders in an effort

to encourage sound management.[6]

Finally, the commission argues that reversing this case on retroactive rate making grounds would be inconsistent with one of the purposes underlying the prohibition—to prevent the utility from recovering in future rates, costs incurred due to past mismanagement. Again, we disagree.

The commission has determined that WPL's future costs under the WECO contract, as renegotiated, are reasonable. The question before us, therefore, is not whether the company's *future* rates are unjust as allowing it to *recover* amounts lost due to past mismanagement, but whether the commission may order the *refund* of amounts validly collected as *past rates,* which the commission now believes were higher than they should have been because of the company's imprudent management. We do not see the result in this case as frustrating any of the purposes underlying the prohibition against retroactive rate making.

## Rate Base Adjustment

A utility's rate base is the physical plant which has been purchased with the stockholder's investment dollars, and with dollars that the utility has borrowed; and

---

[6]The commission suggests that because it could have done so—because it could have imposed a rate-of-return "penalty" which would have accomplished the same result as the ordered refund, its order should not be reversed. We have before us, however, only the order the commission actually entered, not one it believes it might have entered. *See Northwestern Wisconsin Electric Co. v. Public Service Comm'n,* 248 Wis. 479, 484, 22 N.W.2d 472, 474 (1946) ("It is . . . not for this court to redraft orders of the commission in order to conform them to some unexpressed intent of the commission.").

rates are set based on what the commission determines is an appropriate return on that base.

The commission's rules governing the extension of service to new customers are designed to share the costs of constructing additions to the utility's physical plant needed to provide such service equitably among all customers, new and old. Wis. Adm. Code sec. PSC 113.80. The principle is simple: existing customers should not have to bear the cost of constructing facilities necessary to extend electric service to new customers beyond the amount all customers pay for service—and that is what would occur if these additional extension costs were simply added to the utility's rate base.

Thus, the new customers are required to make a "contribution in aid of construction" for the necessary new facilities, which is basically the cost of extending the service to the customer, less the amount the customer would otherwise pay for electrical service. Wis. Adm. Code sec. PSC 113.94. The contribution is refundable over the next five years, if additional customers obtain service using the new facilities; and, when refunded, the amount is then added to the utility's rate base.

In this case, after determining that WPL had not collected contributions in aid of construction of facilities to extend service to a particular group of new customers (primarily developers)—in an amount determined by the commission to be $494,777—the commission ordered that that amount "shall be imputed and recorded as being provided by the utility and that no portion of said amount shall be construed as a refundable advance." The effect of the order is to treat the $494,777 as if it had been a nonrefundable contribution in aid of construction by the new customers. And the net result is that the company's rate base was reduced by that amount.

The trial court concluded that the commission's order was invalid for two reasons. First, the court treated the rate-base reduction as a penalty for the utility's failure to collect the contributions as required by the code[7] and ruled that the commission lacked the statutory authority to impose such a penalty. For the same reasons offered in support of its conclusion with respect to the coal cost refunds, the court concluded that the rate base "penalty" constituted impermissible retroactive rate making.

Second, the court ruled that even if the commission possessed the statutory authority to take the action it did, it had failed to make the required findings or to state the reasons underlying its action. In particular, the court concluded that the commission had wholly failed to explain how it arrived at the $494,777 figure in light of the testimony of its staff indicating a substantially higher amount.

On appeal, the commission does not point us to any statute authorizing its action. Its argument consists primarily of a statement that WPL's failure to collect the contributions resulted in its ratepayers being charged for the cost of extending facilities to these particular "favored" customers, as well as the carrying charges on the money used to build the new facilities, and that all this illegally inflated the utility's rate base. It then states:

---

[7]The court reasoned that because the $494,777 was said to represent "the value of the entire uncollected contribution," rather than simply "the cost of servicing the amount of the contribution from the time it should have been collected until the time it would have been refunded," the rate base reduction "imposes a penalty far in excess of the additional cost borne by the existing ratepayers."

This is, under the Administrative Code,[8] illegal, and the Commission has the responsibility to ensure [that] rates do not contain illegal charges. These charges should never have been included in the rate base. There is no penalty involved in taking them off. It is simply a rectification of an error in stating the rate base.

While the argument is sketchy, our *de novo* review of the issue satisfies us that the commission was neither imposing a penalty nor engaging in retroactive rate making when it adjusted WPL's rate base to reflect the uncollected contributions.

When the utility failed to collect the contributions as required by the administrative code, its rate base was increased by the amount it expended to construct the special facilities necessary to extend service to the new customers. And because there were no offsetting contributions from these customers, the company's existing ratepayers were absorbing service extension costs which should have been paid ("contributed") by the new customers. In addition, as the commission notes, the carrying charges on the funds used to build the facilities were also reflected in the existing customers' rates.

Because of the company's failure to collect the contributions, an inequity arose which the administrative rules on service extensions are designed to prevent; and we believe the commission could, under its general rate-

[8]The commission does not provide a particular code reference as the basis of its claimed authority to enter the order. While we generally do not consider such unsupported arguments, *Racine Steel Castings v. Hardy,* 139 Wis. 2d 232, 240, 407 N.W.2d 299, 302 (Ct. App. 1987), *rev'd on other grounds,* 144 Wis. 2d 553, 426 N.W.2d 33 (1988), we will assume, as the trial court did, that the commission relies on its general rate making authority as the basis for its action.

making authority, adjust WPL's rate base to reflect a proper and appropriate rate base.[9]

We agree with the circuit court, however, that the commission has not offered any evidentiary basis for the amount of the rate base reduction. The commission attempts to justify the $494,777 figure by pointing to a staff exhibit purporting to examine some seventy-eight extensions and concluding that the excess of total project costs over uncollected contributions amounted to $600,935 and stating:

> During the proceeding, Commission staff and WP&L staff continued to work on the problem of WP&L's service extension bookkeeping, and WP&L continued to attempt to explain the lacunae and inconsistencies. *As a result of this ongoing off-the-record discussion, the staff was willing to reduce the $600,935 to a smaller number . . ..*

---

[9]We disagree with the trial court's conclusion that, if the commission's general rate-making authority provides the basis for its action, the reduction of the company's rate base amounts to retroactive rate making.

As one of the intervenors, Wisconsin Public Service Corporation, notes in its brief to us, it does not violate the ban against retroactive rate making for the commission to "disallow imprudent capital expenditures from a utility's rate base." We think the analogy holds here.

Contrary to the administrative code, WPL failed to obtain the contributions from its new customers and the commission, possessed with the authority under sec. 196.02(1), Stats., "to supervise . . . every public utility in this state and to do all things necessary and convenient to its jurisdiction"—a power described by the supreme court as "broad, comprehensive and all-inclusive," *Hotel Pfister v. Wisconsin Telephone Co.,* 203 Wis. 20, 23, 233 N.W. 617, 618 (1930)—can properly adjust the company's rate base to compensate for the economic effects of that failure.

As the emphasized language suggests, the problem here is an absence of *on*-the-record evidence indicating how the commission arrived at the $494,777 figure.

The commission asserts that its staff selected five service extensions, which it characterizes as "the most blatantly incorrect projects" of the seventy-eight reviewed. It states that the total overage for the five amounted to $229,554, and that the staff then added a sixth project, where the uncollected amount was $265,223. The commission points out that adding the two figures together yields a total $494,777 and offers this calculation as support for its order. The commission's addition is correct, but its brief fails to point to evidence to substantiate its other assertions.

The only evidence mentioned in the commission's brief is a staff exhibit listing the costs and customer contributions (or lack of them) for the seventy-eight projects, showing a total "overage" of $600,935. Beyond that, however, we are unable to ascertain any support in the exhibit for the commission's claim that its staff selected the six "most blatant[ ]" overages—or, if the staff selected them as the basis for the rate base reduction, why it did so. Indeed, the commission's assertion that these projects were the most egregious of the lot appears to be belied by the exhibit itself.[10]

---

[10]The exhibit indicates that the $600,935 figure is the sum of the "overages" on the seventeen projects (of seventy-eight examined) in which expenses were made and no contributions collected. It also reveals, however, that the overages on the five projects the commission claims its staff concentrated on because they were the most "blatant[ ]" examples of the problem, were: $53,766 (Project 898431); $0 (Project 1301621); $0 (Project 1229421); $102,122 (Project 1325951); and $0 (Project 909171). Other projects in the list of seventy-eight show overages of $249,729 (Project 1291541), $57,236 (Project 1022391), and

 As a general rule, an appellate court will not consider arguments unsupported by references to the record. *Lechner v. Scharrer,* 145 Wis. 2d 667, 676, 429 N.W.2d 491, 495 (Ct. App. 1988). The record in this case is both complex and voluminous; and in such a situation "it is not the duty of this court to sift and glean the record in extenso to find facts which will support an assignment of error." *Keplin v. Hardware Mut. Casualty Co.,* 24 Wis. 2d 319, 324, 129 N.W.2d 321, 323 (1964).

 Because the commission has failed to establish that its order effectively reducing WPL's rate base by $494,777 is supported by substantial evidence in the record, its order cannot stand. Accordingly, we affirm the circuit court in all respects.

*By the Court.*—Order affirmed.

---

$35,314 (Project 1276571)—as well as at least eleven others with overages more than $0—ranging from $18 (Project 892101) to $24,348 (Project 1230911).

It may be that we are reading the exhibit incorrectly, but that is the chance the commission takes when it offers such scant guidance to such complex issues and exhibits. And that, partially at least, is the point.