CORNWELL PERSONNEL ASSOCIATES, LTD., Plaintiff-
Respondent

v.

LABOR & IDUSTRY REVIEW COMMISSION, Defendant-
Appellant,

Robert E. LINDE, Defendant.

Court of Appeals

*No. 92-1718-FT. Oral argument January 13, 1993.—Decided
March 30, 1993.*

(Also reported in 499 N.W.2d 705.)

539

For the defendant-appellant the cause was submitted on the briefs and oral argument of *Earl G. Buehler*, of Madison.

For the plaintiff-respondent the cause was submitted on the briefs of *Petrie & Stocking S.C.* by *J.D. Thorne* of Milwaukee. Oral argument by *J.D. Thorne*.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

WEDEMEYER, P.J. The Labor and Industry Review Commission (LIRC) appeals from an order of the circuit court which reversed the majority decision of LIRC in an unemployment compensation benefits case. The circuit court held that Robert E. Linde was not entitled to unemployment compensation benefits because Linde quit his employment and none of the quit disqualification exceptions provided a basis for him to retain his benefits. Because Linde quit with "good cause attributable to the employing unit," as provided under sec. 108.04(7)(b), Stats., as initially found by LIRC, we reverse.

## I. BACKGROUND

Robert E. Linde commenced his employment with Cornwell Personnel Associates, LTD. (Cornwell), a temporary help employer, on August 18, 1987. Linde's first work assignment was with Western Products where he was a general laborer. His rate of pay was $4.25 per hour.

Linde received periodic wage increases at Western Products and was receiving $5.75 per hour when he was laid off from this position on February 3, 1989. On April 4, 1989, Linde received an assignment at Production Stamping as a punch press operator where he received $5 per hour. Production Stamping terminated this work on April 10, 1989. The following day Linde called Cornwell for an additional work assignment, as required by the employment contract, and was offered a choice of three assignments.[1] Linde did not accept any of the assignments and, therefore, he believed that this constituted a termination "with good cause" for unemployment compensation purposes. Linde subsequently applied for unemployment compensation which Cornwell challenged before LIRC.

LIRC concluded that Linde could remain eligible for unemployment compensation benefits despite the fact that he quit his employment with Cornwell. LIRC determined that Linde quit "with good cause attributable to the employing unit" within the meaning of sec. 108.04(7)(b), Stats. LIRC also concluded that Linde remained eligible for benefits within the meaning of sec. 108.04(7)(e), Stats.

Cornwell initiated an action for judicial review of the LIRC decision in the circuit court. The court concluded that Linde quit his employment and that such quitting was not for any exception to the disqualification provisions as delineated in sec. 108.04(7), Stats. LIRC appeals.

---

[1] The first assignment was with Chemlawn, a lawn care company, for route work at $4.25 per hour. The second job was with Clean Test Products, for hand packaging at $4 per hour. The third job was with Masco, for commercial painting, also at $4 per hour.

## II. DISCUSSION

A. Standard of Review

A commission's factual findings are binding on this court as long as they are supported by substantial and credible evidence in the record. Sections 102.23(1)(a) and 108.09(7)(b), Stats.; *Holy Name School v. DILHR*, 109 Wis. 2d 381, 385-86, 326 N.W.2d 121, 124 (Ct. App. 1982). Substantial evidence is evidence that is relevant, credible, probative, and of a quantum upon which a reasonable fact finder could base a conclusion. *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 54, 330 N.W.2d 169, 173 (1983). Facts of mere conjecture or a mere scintilla of evidence are not enough to support LIRC's findings. *Id.* The evidence, however, is to be construed most favorably to the commission's findings. *Id.* at 53, 330 N.W.2d at 173.

Legal conclusions drawn by the commission from its factual findings are subject to judicial review. *Wehr Steel Co. v. DILHR*, 106 Wis. 2d 111, 117, 315 N.W.2d 357, 361 (1982). The commission's construction of a statute and its application to a particular set of facts is a question of law. *Bucyrus-Erie Co. v. DILHR*, 90 Wis. 2d 408, 417, 280 N.W.2d 142, 146-47 (1979). Although a commission's resolution of questions of law does not bind a reviewing court, some deference is appropriate due to the commission's expertise. *Berns v. WERC*, 99 Wis. 2d 252, 261, 299 N.W.2d 248, 253 (1980). If the commission's statutory interpretation "reflects a practice or position long continued, substantially uniform and without challenge by governmental authorities and courts," great weight will be accorded the commission's decision. *Id.* (Citation omitted). This deference will also be extended

to a commission's application of a particular statute to a particular set of facts. *Wisconsin's Envtl. Decade, Inc. v. Public Serv. Comm'n*, 98 Wis. 2d 682, 694, 298 N.W.2d 205, 209 (Ct. App. 1980).

## B. Analysis

This is a case of first impression in that it involves the application of the unemployment compensation statutes to the temporary help industry.[2] Although the temporary help industry is not a new phenomenon in the work place, because of the ever-increasing pressure in the business community to reduce personnel costs, it has experienced an unusual growth rate.[3] The contours of the industry's position in the employee-employer dynamic, as well as the consequences of such status, have yet to be clearly defined. This case addresses one of many possible issues that may arise in the future.

---

[2] Our review of the case law in Wisconsin, as well as the remaining 49 states, reveals the uniqueness of the issue presented by the case-at-bar. Although the issue is presently novel, as more attempts are made to apply the unemployment compensation statutes to the temporary help industry, it will become readily apparent to those involved in the system that the unemployment compensation statutes were not necessarily designed to accommodate the vagaries of the temporary help industry.

[3] *See, e.g.*, National Association of Temporary Services, Press Release (Dec. 11, 1992), where the Association provides statistics regarding the growth of the temporary help industry over the past 21 years. The growth rate is truly impressive. In 1970, the number of average daily employees working for temporary help employment agencies was less than 20,000. By 1991, that number had increased to over 1.1 million average daily employees. Further, the temporary help industry payroll increased from $547.4 million in 1970 to over $14 billion in 1991. There is little doubt that the temporary help industry has become an integral part of our working society.

In the temporary help arena, an employment relationship exists between the employee and the temporary help employer. In the present case, the employment relationship was to continue if Cornwell immediately offered a new placement to Linde when he informed Cornwell that his prior placement had ended. When contacted on April 11, Cornwell offered Linde a choice of three placements. Thus, the employment relationship continued until Linde severed it by refusing the new placements. Linde's refusal is regarded as a "quit" or voluntary termination for unemployment purposes.

Where an employee quits an employment relationship, sec. 108.04(7)(a), Stats., generally disqualifies that individual from receiving unemployment benefits.[4] Benefits, however, may still be received if the employee quit for one of the exceptions specified in sec. 108.04(7)(am)-(o), Stats.

LIRC concluded that Linde could remain eligible for unemployment compensation benefits despite the fact that he quit his employment with Cornwell. LIRC determined that Linde quit with "good cause attributable to the employing unit" within the meaning of sec. 108.04(7)(b), Stats.[5] LIRC based its findings on a signif-

---

[4] Section 108.04(7)(a), Stats., reads, in part:

If an employe terminates work with an employing unit, the employe is ineligible to receive benefits until 4 weeks have elapsed since the end of the week in which the termination occurs and the employe earns wages after the week in which the termination occurs equal to at least 4 times the employe's weekly benefit rate under s. 108.05(1) in employment or other work covered by the unemployment compensation law of any state or the federal government.

[5] Section 108.04(7)(b), Stats., states that:

Paragraph (a) does not apply if the department determines that the employe terminated his or her work with good cause attributable to the employing unit. In this paragraph, "good cause" includes, but is

icant reduction in wages to a level substantially below prevailing wage rates, particularly in light of the relatively low wage level that Linde initially received.

Good cause attributable to an employer for quitting must involve some fault on the employer's part "and must be real and substantial." *Kessler v. Industrial Comm'n*, 27 Wis. 2d 398, 401, 134 N.W.2d 412, 414 (1965); *Nottelson v. ILHR Dep't*, 94 Wis. 2d 106, 120, 287 N.W.2d 763, 770 (1980). Here, LIRC determined that the three jobs offered to Linde resulted in a wage reduction of fifteen to twenty percent from his wage rate at Production Stamping. Moreover, LIRC found that the offers were all substantially lower than prevailing wage rates for similar work in the employee's labor market, according to department policy in effect at the time the job offers were made.[6] Thus, LIRC determined that

---

not limited to, a request, suggestion or directive by the employing unit that the employe violate federal or Wisconsin law.

[6] Currently, the Department determines whether a wage is substantially less favorable than prevailing for purposes of sec. 108.04(9), Stats., by determining whether it falls within the lower quartile of the population of workers doing similar work. Prior to July 27, 1990, however, the Department instead considered whether the wage offered fell in the lowest quartile of the wage range. See the July 27, 1990, Job Service and Unemployment Compensation Directive, Index No. 505, 90-5. The jobs offered Linde occurred prior to July 27, 1990. A labor analyst testified that the job with ChemLawn was classified as general labor with a wage range from $3.80 to $9.50 per hour. The lowest quartile of that wage range would be between $3.80 and $5.25 per hour. The amount offered by Cornwell of $4.25 per hour was within the lowest quartile of the wage range for that position. With respect to the second job offered to Linde at Clean Test Products, the labor market analyst first classified the job as that of a hand assembler with a wage range of $3.80 to $8.20. The analyst later

the lower wages paid by the jobs Cornwell offered met the standard required for "good cause attributable to the employing unit." In light of the deference to be accorded LIRC's determinations, this court will not disturb these findings on appeal. The findings were supported by substantial and credible evidence from the labor market analyst. Consequently, we concur with LIRC that Linde quit his job with Cornwell "with good cause attributable to the employing unit," and therefore, Linde met an exception to the voluntary quit disqualification of sec. 108.04(7)(a), Stats., and remained eligible for benefits.

The trial court concluded that sec. 108.04(7)(f), Stats., precluded a finding of good cause. We do not agree. Section 108.04(7)(f), states that:

> Paragraph (a) does not apply if the department determines that the employe terminated his or her work because the employe was transferred by his or her employing unit to work paying less than two-thirds of his or her immediately preceding wage rate with the employing unit, except that the employe is ineli-

conceded that a classification of packager may have been more appropriate. The wage range for a packager was $3.50 to $12 per hour. In either case, the wage offered by Cornwell to Linde of $4 per hour fell within the lowest quartile of the wage range for that position. The labor market analyst testified that the third job at Masco could either be classified as hand brush painting or spray painting metal parts with wage ranges of $4.80 to $13.70, and $5 to $12 per hour, respectively. However, the testimony of the employer's president indicated that the job would be better classified as hand packaging, same as the Clean Test Products job. Regardless of the classification of the Masco job, the wage offered by Cornwell of $4 per hour was within the lowest quartile of the wage range for that position.

548

gible to receive benefits for the week of termination and the 4 next following weeks.

Section 108.04(7)(f) is worded such that it applies only in cases where the employee is transferred to work paying less than two-thirds of his or her immediately preceding wage rate. However, we find no indication that where an employee is transferred to work paying more than two-thirds of the previous wage rate, sec. 108.04(7)(f) necessarily precludes a finding of good cause. On the contrary, we conclude that good cause can exist where an employee is transferred to a job above the two-thirds threshold. In this case, LIRC made a finding of good cause not only for a significant reduction in wages, but also because the wages offered were substantially below prevailing wages for similar work in the locality. We defer to LIRC on their application of the statute to the facts in this case. Thus, irrespective of the fact that Linde's offers of employment from Cornwell were above the two-thirds threshold, a finding of good cause was not inappropriate.

██ LIRC also noted the possible application of sec. 108.04(7)(e), Stats.,[7] which would provide another quit disqualification exception. Although this determination is not dispositive, we wish to offer our reading of the section because both parties briefed the issue and it is reasonable to expect that, if the issue is not now addressed, it will be raised repeatedly in the future. *See State ex rel. Jackson v. Coffey*, 18 Wis. 2d 529, 533, 118 N.W.2d 939, 941 (1962) (where issue is fully briefed and

---

[7] Section 108.04(7)(e), Stats., states:

Paragraph (a) shall not apply if the department determines . . . that the employe accepted work which the employe could have refused under sub. (9) and terminated such work within the first 10 weeks after starting the work.

likely to recur in the future, the court has the authority to address the issue).

Because Cornwell is a temporary help agency that assigns different jobs to the same employee, it must be determined what constitutes "new work" under sec. 108.04(9), Stats.[8] Each new assignment from a temporary help agency to its employee is not to be regarded as "new work." However, if an employee is recalled to work after an indefinite layoff this, under appropriate circumstances, is considered "new work." In *Allen-Bradley Co. v. DILHR*, 58 Wis. 2d 1, 205 N.W.2d 129 (1973), the court stated that "there is no necessity for limiting its ['new work'] applicability to new job applicants, and denying its protections to indefinitely laid-off employees recalled to work. In such situations, the work is new even though the worker is not." *Id.* at 6, 205 N.W.2d at 131. In the present case, Linde was regarded as being indefinitely laid-off before he accepted the Production Stamping job. Thus, Linde's Production Stamping job is regarded as "new work" under the statute.

The record is clear that Linde did not refuse to accept the Production Stamping job. Thus, sec. 108.04(9), Stats., is not applicable since that section requires a refusal "to accept new work." However, sec. 108.04(7)(e), Stats., provides a hypothetical exception if LIRC determines "that the employe accepted work

---

[8] Section 108.04(9), Stats., in pertinent part, states:

Benefits shall not be denied under this chapter to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

. . . .

(b) If the wages, hours (including arrangement and number) or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality.

which the employe *could have refused* under sub. (9) and terminated such work within the first 10 weeks after starting the work." (Emphasis added.) LIRC made such a decision. LIRC found that Linde could have refused the work under sub. (9) because: (1) the wages were substantially less than those prevailing for similar work in the locality; and (2) he terminated his work with Cornwell within ten weeks of starting the work.[9]

We do not agree with LIRC's interpretation of the statute. Specifically, the section states that the *employee* must terminate "such work", (as opposed to the employer, Cornwell), within ten weeks after starting the work. "Such work" is referring to the "new work" under sub. (9). Linde terminated the employment relationship between Cornwell and himself by refusing to accept the three job offers. These job offers did not constitute "new work" since Linde was not indefinitely laid off when these offers were made. Moreover, Linde did not terminate the Production Stamping job (which was "new work"); rather, Production Stamping did. Thus, sec. 108.04(7)(e), Stats., is inapplicable. Therefore, under the factual scenario presented by this case, sec. 108.04(7)(e) does not provide a basis for an exception to the voluntary disqualification rule of sec. 108.04(7)(a), Stats.

---

[9] With respect to the Production Stamping job, no specific wage range is available. The record established, however, that the wage range for general labor was from $3.80-$9.50 per hour. LIRC then inferred that the Production Stamping job would be at least as high as a general labor job, noting that the prevailing rate was likely to be the same, if not higher, than for that of a general laborer. Production Stamping's rate of payment, $5 per hour, thus fell in the bottom quartile for a general laborer which was from $3.80-$5.25. The Production Stamping wage rate, therefore, was not prevailing according to LIRC standards.

*By the Court.*—Order reversed.