John F. BARNES, Terry Young, Erik Brynildson, Mark Koeppl, Lu Kummerow, and The Fund for Animals, Petitioners-Appellants,†

v.

DEPARTMENT OF NATURAL RESOURCES, an Agency of the State of Wisconsin, Respondent-Respondent.

Court of Appeals

No. 92–2603. *Submitted on briefs June 4, 1993.—Decided July 14, 1993.*

(Also reported in 506 N.W.2d 155.)

†Petition to review granted.

293

On behalf of the petitioners-appellants, the cause was submitted on the briefs *J. Reed Millsaps* of the *Law Office of Michael Maduff* of Chicago, Illinois.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general and *Philip Peterson*, assistant attorney general.

Before Nettesheim, P.J., Brown and Anderson, JJ.

ANDERSON, J. John F. Barnes, Terry Young, Erik Brynildson, Mark Koeppl, Lu Kummerow, and the Fund for Animals (Barnes) appeal from a circuit court judgment affirming the Department of Natural Resources' (DNR) decision to refuse to add the bobcat to Wisconsin's list of threatened species under sec. 29.415, Stats., the Wisconsin endangered and threatened species statute. Barnes contends that the DNR erred in not choosing to list the bobcat as a threatened species because: (1) the continued existence of the bobcat in Wisconsin is "in jeopardy" under the correct interpretation of sec. 29.415; (2) the DNR's finding that the population of bobcats in northern Wisconsin is 1500 is not supported by substantial evidence; and (3) the language and legislative history of sec. 29.415 indicate that if there is any doubt that a species should be listed, the agency should err on the side of caution and list the species. We affirm the circuit court's judgment because we conclude that the DNR's interpretation of the statute is reasonable, the facts before the DNR did not compel as a matter of law the listing of the bobcat as a threatened species, and the DNR properly exercised its discretion in refusing to add the bobcat to the threatened species list.

HISTORY OF THE CASE

Barnes petitioned the DNR under sec. 29.415, Stats.,[1] for a review to have the bobcat added to Wis-

___

[1] Section 29.415, Stats., states in relevant part:

**Endangered and threatened species protected....**

 . . . .

 (3) ENDANGERED AND THREATENED SPECIES LIST. (a) The department shall by rule establish an endangered and threatened species

consin's threatened species list. At the time of the petition there were no restrictions on the number of bobcats which could be hunted or trapped per season in northern Wisconsin, but bobcats were protected from all hunting and trapping in southern Wisconsin.[2]

The DNR proceeded to conduct a review and asked University of Wisconsin Department of Wildlife Ecology Professors Lloyd Keith and Stanley Temple, Minnesota DNR wildlife management expert William Berg, and Wisconsin DNR staff members Bill Creed and Bruce Kohn to examine the petition and other materials in order to give their conclusions and recommendations. The DNR also consulted relevant literature on the subject. The following are short summaries of the most important information submitted to the DNR.

---

list. . . . Wisconsin endangered species shall be compiled by issuing a proposed list of species approaching statewide extirpation. Wisconsin threatened species shall be compiled by issuing a proposed list of species which appear likely, within the foreseeable future, to become endangered. . . . Wild animals . . . shall be deemed approaching statewide extirpation if the department determines, based upon the best scientific and commercial data available to it, after consultation with other state game directors, federal agencies and other interested persons and organizations, that the continued existence of such wild animals . . . is in jeopardy.

. . . .

(c) The department may upon the petition of 3 persons review any listed or unlisted wild animal . . . if the persons present scientific evidence to warrant such a review, after which the department may by hearing and rule amend the statewide list.

[2] The line which divides northern and southern Wisconsin for purposes of the bobcat harvest is State Trunk Highway 64, running from New Richmond on Wisconsin's western border to Marinette on its eastern border.

## The Petition

The petition requested that the bobcat be listed as a threatened species as "it is clear that the current bobcat population is in jeopardy" and that the DNR's current bobcat management system has "established the base for disaster." These conclusions were based upon an analysis of the number of bobcat kill permits issued and the number of bobcats killed from 1980 to 1989. The petition alleged that there was a dramatic reduction in bobcats killed in 1988–89, and in light of the increasing number of permits issued which should have yielded the opposite result, the decrease was due to a drastic reduction in the bobcat population.

## Bill Creed's 1989 Report to DNR Bobcat Committee Members

This paper represented the DNR's latest evaluation and conclusions about the status of the bobcat population in Wisconsin. The report was based in part on the sex, age and reproductive data obtained from carcass analyses of more than 800 bobcats since 1983. Creed stated that since 1983 there were no significant differences in age structure between years or between districts in Wisconsin. He stated that his estimate of a thirty-five percent mortality rate was not excessive according to literature on the subject. He used a population model based on a model used in Minnesota and estimated the Wisconsin bobcat breeding population to be approximately 1500 and relatively stable. Creed also examined the possibility of a quota system for bobcat harvest and concluded that such a system should ensure the harvest of at least 150 bobcats per year, in order to allow for the continued use of the population modeling approach to monitor the bobcat population.

## Professor Lloyd Keith's Analysis

In his analysis of the petition and data supplied by the DNR, Keith stated:

> For reasons that I think are clear to everyone at [the DNR], none of the 4 available indices to the bobcat population trends in Wisconsin by itself is satisfactory. That is, neither the registered harvest, the harvest per licensed hunter, the track count index, nor the scent-post survey are presently capable of tracking year-to-year or long-term population trends. What this obviously means is that WDNR cannot demonstrate a stationary population, nor can the advocates of more protection demonstrate a population decline. I suggest that obtaining an accurate annual population index, whose precision can be estimated and is acceptable, should be a high-priority item. You will note that one "possible" conclusion from the analysis I conducted is that the Wisconsin bobcat population is declining. [Emphasis in original.]

Based on the available data, Keith used a life-table analysis of the 1983–88 age ratio data for bobcats older than one year. His results yielded mean estimates of 670 and 1176 bobcats prior to the time that bobcats give birth in the spring. He noted that these estimates were "well below the 1,500 bobcats allegedly present in Wisconsin 'pre-birth,'" and that other factors could indicate that his estimates may be too high.

## William Berg's Analysis

Berg recognized that there are limitations to the life-table analyses used by Keith and the population models used by the Wisconsin and Minnesota DNRs. He recommended that Wisconsin intensify its popula-

298

tion trend surveys. Berg stated that "Wisconsin bobcats seem to have a stable age-sex structure, and a relatively stable harvest; these data can infer over a prolonged period that the population is relatively stable." (Emphasis in original.) He compared the analyses. by the Wisconsin DNR, Keith, and the Minnesota DNR from which he concluded:

> A sustained stable harvest, and stable age, sex, and inutero reproductive parameters, combined with at least some population indices that suggest a stable population, suggest to me that the population, too, is very close to stable. It would be a drastic and likely unnecessary move, indeed, to close the bobcat hunting and trapping season at this time.

### Professor Stanley Temple's Analysis

Professor Temple analyzed the data provided by the DNR, solicited additional information from Creed and made a brief review of recent literature on the bobcat. Temple's first conclusion was that the DNR had deficiencies in its bobcat management program, most notably that it lacked an accurate estimate of the population size "or at least a reliable index to population size." He then noted that "[a]lthough the petition by Barnes et al. raises some important issues, they are no more able to prove any of their assertions than the DNR is able to prove theirs." Temple criticized Berg's population estimates because in "back-calculat[ing]" the population size from statistics on the registered harvest "you would have to make a number of highly suspect assumptions."

Temple proposed an alternate method of estimating the population "only because [the results] are different from the results of the back-calculations you

used to support the notion that the population's size is 1500, not because I consider them to be an example of the ideal approach to estimating population size." His results showed a population of 872. He stated that based upon the available information, he could not conclude that the bobcat population in Wisconsin is threatened. He did think it was "reasonable to hypothesize that it is being overharvested and that it is declining as a result." Temple recommended that more accurate and extensive efforts be made to determine actual bobcat population density in selected areas.

### Bill Creed's and Bruce Kohn's Review

Keith's and Temple's analyses were critiqued by Creed and Kohn. They stated that each analysis contained errors and that according to their adjusted calculations, the mean estimates of pre-birth bobcat populations using Keith's models should be 960 and 1920, and Temple's model with adjustments produced an estimate of 1100.

### DNR Decision

Without conducting a hearing but after soliciting public comment, the DNR concluded that "there is no basis to list the bobcat as a threatened species for there is no evidence to support a finding that the bobcat is likely within the foreseeable future, on the basis of scientific evidence to become endangered." The DNR concluded that evidence presented to the DNR estimated a population of 1500 bobcats in the unprotected northern part of Wisconsin and indicated a "sizeable unexploited population" in the southern part of Wisconsin. Although the DNR recognized that some evidence pointed toward a slightly declining bobcat population, the DNR reasoned that such a showing was

not sufficient to classify the bobcat as a threatened species. The DNR concluded that "[u]p to 58% of the variation in bobcat harvest by hunters over the period from 1980 to 1989 can be explained by variations in the number of days of December snowfall and average December temperature."[3]

The DNR's decision evaluated four possible alternatives for bobcat population management: (1) no change in the present policy, (2) establish threatened status for the bobcat, (3) list the bobcat as a unique protected species for which hunting or trapping are not allowed, and (4) develop a quota system for the bobcat harvest. Based on various factors, the DNR decided that developing a quota system was the preferred alternative.[4]

### Circuit Court Review

Barnes petitioned the circuit court to review the DNR's decision pursuant to sec. 227.53, Stats., and requested that the court vacate the DNR's decision and direct the DNR to list the bobcat as a threatened species in Wisconsin. Barnes argued that the DNR's decision was not supported by substantial evidence in the record and was not consistent with the legislative intent behind sec. 29.415, Stats. Barnes contended that if the scientific data is inconclusive as to whether a species is threatened or nonthreatened, the DNR should err on the side of caution and list the animal as threatened. The circuit court affirmed the DNR's deci-

---

[3] The bobcat hunting and trapping season in northern Wisconsin runs from the Saturday nearest October 17 and continues through December 31. *See* Wis. Adm. Code sec. **NR 10.01**(3)(d).

[4] The DNR established a quota system for bobcats pursuant to this recommendation. *See* Wis. Adm. Code sec. **NR 10.145**.

sion, holding that a lack of information is not a basis for listing a species as threatened. Barnes appeals.

APPELLATE REVIEW OF AN AGENCY DECISION

When an appeal is taken from such a circuit court order, we review the decision of the DNR, not the circuit court. *See Richland School Dist. v. DILHR,* 166 Wis. 2d 262, 273, 479 N.W.2d 579, 584 (Ct. App. 1991), *aff'd,* 174 Wis. 2d 878, 498 N.W.2d 826 (1993). Although we do not defer to the opinion of the circuit court, that court's reasoning may assist us. *Id.* Review of the DNR's decision is confined to the record. Section 227.57(1), Stats.

The reviewing court must affirm the agency's action "[u]nless the court finds a ground for setting aside, modifying, remanding or ordering agency action or ancillary relief under a specified provision of [sec. 227.57, Stats.]." Section 227.57(2), Stats. Such decisions are made by according due weight to "the experience, technical competence, and specialized knowledge" of the DNR, as well as "discretionary authority conferred upon it." Section 227.57(10). Barnes argues that we need not give deference to the DNR's decision because the DNR has no experience or specialized knowledge in interpreting whether a species is threatened. We disagree.

The DNR's decision to not list the bobcat as a threatened species is entitled to great deference for several reasons. The first is that the DNR has the experience in protecting threatened and endangered species. While this is the first time that the determination of a species' threatened status was in response to a petition under sec. 29.415(3)(c), Stats., the DNR has

302

examined numerous species' threatened status on its own initiative pursuant to sec. 29.415(3)(a). *See* Wis. Adm. Code sec. **NR 27.03** (history of code section showing changes made to endangered and threatened species lists since 1979). Barnes makes no argument that the DNR considers different criteria under the two methods of review, and we see no basis for making such a conclusion. Therefore, we conclude that the DNR has experience to determine whether a species should be given threatened status.

The DNR also has the requisite technical competence and specialized knowledge in protecting threatened and endangered species. An important function of the DNR is the evaluation and maintenance of wildlife in Wisconsin. *See* sec. 23.09(1) & (2)(k), Stats.; sec. 29.174(1) & (4), Stats.; sec. 29.415(7), Stats.; Wis. Adm. Code sec. **NR 1.015**(1). In doing so, the DNR employs persons educated in wildlife management techniques, methods of calculating population estimates, and other such specialized skills related to the protection and conservation of wildlife.

The DNR also has specialized knowledge specifically related to the bobcat population in Wisconsin. Since 1973, the DNR has extensively monitored bobcats beginning with the establishment of a registration requirement, follow-up questionnaires to successful hunters and trappers, and the taking of an inventory of distribution, relative numbers, and habitat conditions of the bobcat. Such efforts have expanded through the years to include track counts and scent-post surveys. Reports and management plans for the bobcat have been prepared periodically by the DNR. Through these efforts, the DNR has accumulated specialized knowledge related to the bobcat.

Even if the DNR did not possess the necessary experience, technical competence and specialized knowledge, we would defer to its decision because the legislature specifically charged the DNR with the duty of administering and applying the statute. Section 29.415(3)(a), Stats., requires the DNR to establish an endangered and threatened species list. Section 29.415(3)(b) requires the DNR to periodically review that list and permits it to revise the list if necessary. Section 29.415(7) requires the DNR to conduct research on the endangered and threatened species of Wisconsin and implement programs directed at conserving, protecting, restoring and propagating selected endangered and threatened species. These directives indicate the legislature's intent that the administration of the statute is delegated to the DNR, and therefore that the DNR's interpretations and applications are entitled to deference. *See City of La Crosse v. DNR,* 120 Wis. 2d 168, 179, 353 N.W.2d 68, 73 (Ct. App. 1984).

BARNES' CHALLENGES TO THE DNR'S DECISION NOT TO
LIST THE BOBCAT AS A THREATENED SPECIES

Section 227.57(4)–(8), Stats., lists instances where a reviewing court may set aside or modify an agency action or remand the case to the agency for further action, keeping in mind that due weight is accorded to the agency's decision. This court must affirm the agency's action unless we find a ground exists for setting aside, modifying, remanding or ordering agency action under sec. 227.57(4)–(8). *See* sec. 227.57(2). Barnes challenges the DNR's decision not to list the bobcat as a threatened species under three of these provisions.

304

## *Facts not Supported by Substantial Evidence*

Barnes contends we should reverse the DNR's decision because it was based upon a finding that there were 1500 bobcats in northern Wisconsin and that this finding was not supported by substantial evidence. This argument is premised on the wrong subsection of sec. 227.57, Stats.

This court may set aside or remand the case to the agency if the agency's action depends on any finding of fact made in a *contested case proceeding* that is not supported by substantial evidence in the record. Section 227.57(6), Stats. The DNR's review of the bobcat's status was not a contested case proceeding—the decision was made without an administrative hearing. Where facts are determined by the agency without a hearing, a challenge of those determinations must be made under sec. 227.57(7):

> If the agency's action depends on facts determined without a hearing, the court shall set aside, modify or order agency action if the facts compel a particular action as a matter of law, or it may remand the case to the agency for further examination and action within the agency's responsibility.

The reviewing court has two remedies available to it if a petitioner has met his or her burden: "(1) 'if the facts compel a particular action as a matter of law,' the court must set it aside, modify it, or order the agency to take some specific action; or (2) if the facts do not compel a particular action as a matter of law, the court 'may remand the case to the agency for further examination and action within the agency's responsibility.' " *R.W. Docks & Slips v. DNR,* 145 Wis. 2d 854, 860, 429

N.W.2d 86, 88 (Ct. App. 1988) (quoting sec. 227.57(7), Stats.). If the court holds that the petitioner has not met his or burden, the court must affirm the DNR decision under sec. 227.57(2) unless the court takes action under another subsection of sec. 227.57.[5]

Because Creed's paper prepared for the bobcat committee in 1989 supported the DNR's conclusion that northern Wisconsin harbors a relatively stable to slightly declining population of 1500 bobcats, and Creed's and Kohn's critique of Temple's and Keith's studies yields estimates close to this figure, we conclude that the facts do not compel us to add the bobcat to the list of threatened species as a matter of law. We also hold that we will not remand the case to the agency under the second avenue of sec. 227.57(7), Stats. Deferring to the agency's expertise in this area, the agency's decision indicates that it is continuing to monitor the bobcat population using additional data as it becomes available and that it believes a quota harvest system is the most promising avenue to pursue at this time for bobcat population management. Therefore, remand is not necessary.

---

[5] Our decision in *R.W. Docks & Slips v. DNR,* 145 Wis. 2d 854, 429 N.W.2d 86 (Ct. App. 1988), should not be read to *require* the reviewing court to set aside or modify the agency decision, order the agency to take some specific action or remand to the agency for further examination all appeals of an agency's decision made without a hearing. *Docks* was not asked to consider, nor was it required to consider, the possibility of an affirmance under sec. 227.57(2), Stats.

### Erroneous Interpretation of the Law

Section 227.57(5), Stats., allows this court to set aside or modify an agency decision if the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action. Where, as here, due weight is accorded an agency's decision, the court will uphold the agency's legal conclusion if it is reasonable, even if an alternative view is also reasonable. *City of Sheboygan v. WERC,* 125 Wis. 2d 1, 4, 370 N.W.2d 800, 802 (Ct. App. 1985). The burden is upon Barnes to establish that the DNR's decision is not reasonable; the DNR is not required to show the reasonableness of its decision. *See La Crosse,* 120 Wis. 2d at 178, 353 N.W.2d at 73.

The DNR concluded that there was no basis to list the bobcat as a threatened species pursuant to sec. 29.415, Stats. When interpreting a statute we first look at the language of the statute itself. *See State v. Seigel,* 163 Wis. 2d 871, 885, 472 N.W.2d 584, 590 (Ct. App. 1991). Words are interpreted according to their common and approved usage. *Id.* at 886, 472 N.W.2d at 590. We may resort to a dictionary for this purpose. *Id.* If the language clearly and unambiguously sets forth the legislative intent, this court is prohibited from examining other aids such as statute history, context and subject matter to ascertain the statute's meaning. *In re J.A.L.,* 162 Wis. 2d 940, 962–63, 471 N.W.2d 493, 502 (1991).

Section 29.415(2)(b), Stats., defines a threatened species as any species "which appears likely, within the foreseeable future, on the basis of scientific evidence to become endangered." An endangered species is in turn defined as a species whose "continued existence as a

viable component of this state's wild animals . . . is determined by the department to be in jeopardy on the basis of scientific evidence." Section 29.415(2)(a).

Barnes contends that the DNR erred by not taking into account the French history of the word "jeopardy" when applying these definitions to determine the bobcat's status.[6] When interpreting the words of a statute, the focus is on the words' common and approved meanings as used in the statute, *see Seigel*, 163 Wis. 2d at 886, 472 N.W.2d at 590, not on the words' historical definitions. The dictionary definition of "jeopardy" is the "exposure to or imminence of death, loss, or injury: DANGER, HAZARD." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1213 (unabr. 1976). We are satisfied that the DNR's conclusion that the bobcat is not a threatened species based on a slightly declining population of approximately 1500 in the northern part of Wisconsin was the result of the application of a similar interpretation of the term "jeopardy" and thus is a reasonable interpretation of sec. 29.415, Stats.

### *Improper Exercise of Discretion*

Barnes contends that the language and legislative history of sec. 29.415, Stats., demand a broader reading of the statute by the DNR to include the bobcat as a threatened species. According to Barnes, these sources indicate that if there is any doubt as to whether a species is threatened, the DNR must err on the side of caution and include the species on the threatened species list.

---

[6] Barnes asserts that "jeopardy" is derived from the French word *jeu parti,* meaning "a divided game, a game in which the chances are even," and consequently if it is an "even call whether the bobcat is at risk or danger, it is in jeopardy."

Barnes' request to have the DNR list the bobcat as a threatened species was made under sec. 29.415(3)(c), Stats. That section states that after a petition is filed and review of a species' status is completed, "the department *may* by hearing and rule amend the statewide list." Section 29.415(3)(c) (emphasis added). In contrast, sec. 29.415(3)(a) & (b) repeatedly makes use of the term "shall."[7] By use of the term "may" in sec. 29.415(3)(c) instead of "shall," the legislature clearly intended the amendment of the list to be a discretionary decision of the DNR. *See Combined Investigative Servs., Inc. v. Scottsdale Ins. Co.,* 165 Wis. 2d 262, 273, 477 N.W.2d 82, 86 (Ct. App. 1991). Such discretionary decisions may be reversed by this court if

> the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; or is otherwise in

---

[7] Section 29.415(3)(a), Stats., states that the DNR "*shall* by rule establish an endangered and threatened species list;" the list "*shall* consist of 3 parts"; issuance of the proposed list "*shall* be followed by solicitation of comments and public hearing;" and wild animals "*shall* be deemed approaching statewide extirpation if the department determines, based upon the best scientific and commercial data available to it . . . that the continued existence of such wild animals . . . in this state is in jeopardy." (Emphasis added.)

Section 29.415(3)(b), Stats., states that the DNR "*shall* periodically review and . . . *may* revise" the threatened species list. (Emphasis added.) The statute also requires that a summary report of the scientific data used to support the amendments "*shall* be maintained by the department." Section 29.415(3)(b) (emphasis added).

violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion.

Section 227.57(8), Stats. We construe Barnes' argument as asking for relief under this section.

The preamble to sec. 29.415, Stats., states:

The legislature finds that certain wild animals and wild plants are endangered or threatened and are entitled to preservation and protection as a matter of general state concern. . . . The states, however, must also assume their responsibility for conserving these wild animals and wild plants and for restricting the taking, possession, transportation, processing or sale of endangered or threatened wild animals and wild plants within their respective jurisdictions to assure their continued survival and propagation for the aesthetic, recreational and scientific purposes of future generations. The legislature finds that by eliminating the taking, possession or marketing of endangered species in this state and by establishing a program for conservation and restoration of these endangered or threatened species, their potential ·for continued existence will be strengthened. The legislature further finds that the activities of both individual persons and governmental agencies are tending to destroy the few remaining whole plant-animal communities in this state. Since these communities represent the only standard against which the effects of change can be measured, *their preservation is of highest importance, and the legislature urges all persons and agencies to fully consider all decisions in this light.*

Section 29.415(1) (emphasis added). We hold that the DNR's decision is not inconsistent with this policy and was a proper exercise of discretion.

310

The policy's main emphasis is on the preservation of animal communities within the state. Of paramount importance is the continued existence of the animal communities and the agency is to act in the best interests of those communities. Although the statute prohibits the taking, possession or marketing of threatened and endangered species and that this prohibition is in their best interests, such actions may not be in every species' best interests. The DNR has concluded that the numbers of the bobcat are such that the species' best interests are served by a quota harvest system in order that continued data may be collected and so that more money is available to monitor the status of the bobcat. The DNR carefully considered the pros and cons of listing the species and recommended a policy which it felt was in the best interests of the species at this time. This is consistent with the policy of the statute.

Within his argument Barnes states that the "DNR is confronted with two choices; either include the bobcat on the list or exclude it from the list." As the DNR's decision reveals, these were not the only two options. It evaluated four possible actions and recommended that a quota harvest system be implemented. This system took into account many of Barnes' concerns, as well as ensuring that the DNR would continue to be able to make decisions based on the best scientific and commercial data available. *See* sec. 29.415(3), Stats.[8] The

[8] The DNR's decision recognized that by establishing the bobcat as a threatened species, it would decrease the amount of money available per protected species for research and methods of protection. The DNR would also lose the relatively inexpensive yet valuable method of data collection through carcass

DNR's action is consistent with the policy underlying the statute and reflects a proper exercise of discretion.

*By the Court.*—Judgment affirmed.

analyses, registration information and follow-up questionnaires of trappers and hunters.