CITIZENS' UTILITY BOARD, Lake Michigan Federation, Lake Michigan Coalition, Thomas Lonsway, and Winnifred Smith, Petitioners-Respondents, †

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Appellant,

WISCONSIN ELECTRIC POWER COMPANY, Intervenor.

UPPER GREAT LAKES GREEN NETWORK, Petitioner-Respondent,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Appellant,

WISCONSIN ELECTRIC POWER COMPANY, Intervenor.

Court of Appeals

*No. 96–0867. Oral argument February 27, 1997.—Decided May 1, 1997.*

(Also reported in 565 N.W.2d 554.)

†Petition to review denied.

For the respondent-appellant the cause was submitted on the briefs of *Barbara E. James* of *the Public Service Commission of Wisconsin* of Madison. Oral argument by *Barbara E. James*.

For the intervenor the cause was submitted on the briefs of *Larry J. Martin and Amy M. Hindman* of *Quarles & Brady* of Madison. Oral argument by *Larry J. Martin*.

For the petitioner-respondent the cause was submitted on the briefs of *Lee L. Cullen and Margaret A. Becker* of *Cullen, Weston, Pines & Bach* of Madison. Oral argument by *Margaret A. Becker*.

Before Eich, C.J., Roggensack and Deininger, JJ.

DEININGER, J.   The Public Service Commission and Wisconsin Electric Power Company appeal an order vacating and remanding the Public Service Commission's decision and order authorizing Wisconsin Electric Power Company to construct an

independent spent fuel storage installation at its Point Beach Nuclear Power Plant. The trial court concluded that the Public Service Commission had erred in determining that the Environmental Impact Statement for the proposed project was adequate. Because we conclude that the Public Service Commission's determination regarding the adequacy of the Environmental Impact Statement should be accorded great weight deference and that it had a rational basis, we reverse the circuit court's order.

## BACKGROUND

Wisconsin Electric Power Company (WEPCO) applied to the Public Service Commission (PSC) for authority to construct and operate an independent spent fuel storage installation (ISFSI) at its Point Beach Nuclear Power Plant. The ISFSI would consist of concrete pads on which a series of "dry storage" casks are placed to house the spent nuclear fuel assemblies from Point Beach's two reactors. Spent fuel assemblies continue to generate heat and are highly radioactive. They must therefore be properly and securely stored for many years following removal from the reactors. Currently, spent fuel assemblies at Point Beach are stored in the facility's spent fuel pool, where they are cooled by circulating water. The pool however, is almost full of fuel assemblies and cannot be modified to house additional assemblies. If an additional storage facility of some type is not constructed, the pools will be full in 1998, and the nuclear generating plant would likely be required to cease operation at that time, even though its two units are federally licensed to operate until 2010 and 2013. Even at present, there is not enough room in the pool to allow for the complete

unloading of both reactors, which would occur during decommissioning of Point Beach.

The accumulation of spent fuel assemblies at Point Beach, and at nuclear generating plants throughout the United States, results from the U.S. Department of Energy's (DOE) present inability to accept high level radioactive waste. Owners of the waste, like WEPCO, are required to store the material until DOE takes title to it.[1] Even though WEPCO has a contract with DOE for the removal of spent fuel from Point Beach to begin in 1998, DOE does not expect that any federal disposal facility will be operational before 2010. The PSC found that "[w]hen or whether DOE will begin taking spent nuclear fuel is a matter of speculation," and that complete removal of all spent fuel from Point Beach will take from 23 to 32 years once removal begins, if removal proceeds according to DOE's current removal schedule. The proposed ISFSI would utilize a type of air-cooled "dry cask," constructed of concrete and steel, which has been approved by the Nuclear Regulatory Commission (NRC) for temporary storage of spent fuel assemblies. The PSC's order authorized the construction and operation of only twelve such casks, although the concrete pads to be constructed would allow for the eventual use of forty-eight casks.[2]

---

[1] *See* 42 U.S.C. § 10151.

[2] The Environmental Impact Statement (EIS) states that "[a] total of 48 casks would be needed to store spent fuel from the start of operation of the storage facility through the end of the present Nuclear Regulatory Commission licenses" for the plant's two units, and the impacts of all 48 casks were analyzed. The EIS also notes that 103 casks would be needed if DOE has not begun taking spent fuel and all the assemblies from the reactors and pool are put into casks as part of the Point Beach decommissioning. It projects yearly worker radiation exposure

Although an Environmental Impact Statement (EIS) is not usually required for applications of the type under consideration, the PSC determined that an EIS was warranted for WEPCO's application to construct an ISFSI.[3] The final EIS, prepared by PSC staff with assistance from the Radiation Protection Unit in the Department of Health and Social Services, encompasses 163 pages plus numerous appendices. Public hearings were conducted October 11 to 14 and 17 to 21, 1994, in Manitowoc, and on October 26 to 28, 1994, in Madison. In its Findings of Fact, Conclusions of Law, Certificate, Order and Interim Order, issued February 9, 1995, the PSC determined that "[t]he EIS adequately describes the environmental effects of the proposed facility and its reasonable alternatives, including effects on public health and safety" and further that:

> [T]he ISFSI as proposed does not constitute a significant risk to public health and that the facility will not create major or significant effects on wild life or plant life. The facility will not create an

and doses to the general public for both 48 and 103 casks. Additionally, Appendix E of the EIS projects the number of casks that may be needed for various assumptions regarding future operation of Point Beach's two units and dates when DOE might begin taking spent fuel.

[3] Section 196.49, STATS., requires a public utility to comply with the PSC's approval requirements prior to commencing construction of an "extension, improvement or addition" to an existing plant. PSC rules categorize "proposed action[s]" for purposes of environmental screening. WEPCO's ISFSI application was deemed a "Type III action," which "do not normally require" an EIS unless the evaluation of a specific proposal indicates that the preparation of an EIS "is warranted for that proposal." WIS. ADM. CODE § PSC 4.10(3).

unreasonable risk to the quality of the water in Lake Michigan.

The PSC's order of February 9, 1995, authorized WEPCO to construct the ISFSI with twelve casks and two concrete pads, but directed the utility to file a new application "before constructing any additional casks or making any other additions to the Facility that would increase its capacity beyond that of the 12 casks authorized herein." The petitioners-respondents (collectively, CUB) petitioned the circuit court for review under § 227.53, STATS. The trial court concluded that "there is no rational basis for the Commission's ultimate determination that the EIS was adequate" because the EIS did not adequately address "reasonably foreseeable future impacts" and "reasonably related alternatives to the ISFSI." The trial court vacated the PSC order and remanded to the agency with directions to supplement the EIS in the areas deemed deficient. From this portion of the circuit court's order, the PSC and WEPCO appeal.[4] Additional facts will be presented in the analysis which follows.

## ANALYSIS

*a.   Standard of Review*

■ All parties concur that our review is directed to the determination of EIS adequacy in the PSC order, not to the EIS itself. There is no dispute that we review the PSC decision and order directly, applying the same standard of review as the trial court but owing no

[4] Although CUB raised numerous claims in the circuit court, only the court's conclusion that the PSC erred in determining the EIS to be adequate is before us on this appeal.

deference to the trial court's conclusions. *See Barnes v. DNR*, 178 Wis. 2d 290, 302, 506 N.W.2d 155, 160 (Ct. App. 1993), *aff'd*, 184 Wis. 2d 645, 516 N.W.2d 730 (1994). There is also agreement among the parties that § 227.57, STATS., governing the scope of review of agency decisions, applies to this appeal. Finally, all parties point to the discussion in *Wisconsin's Environmental Decade, Inc. v. PSC*, 98 Wis. 2d 682, 689–97, 298 N.W.2d 205, 207–11 (Ct. App. 1980) (*WED IV*), as controlling authority on the issue of the proper standard of review to be applied in this case.

There, agreement ceases, however. WEPCO claims the trial court applied the wrong standard of review. It argues that the adequacy of the EIS is a factual matter, and therefore, the PSC's finding must be sustained if there is any "substantial evidence" to support it. *See* § 227.57(6), STATS.[5] The appellants maintain that *WED IV* supports this view:

> On appeal from a decision of an administrative agency, a reviewing court must accept findings of the agency if they can be supported by substantial evidence. Section 227.20(6), Stats. Substantial evidence does not mean the preponderance of evidence, but rather whether reasonable minds could reach the same conclusion reached by the agency.

---

[5] Section 227.57(6), STATS., provides as follows:

(6)   If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

*Id.* at 693–94, 298 N.W.2d at 209.[6]

CUB argues, however, that the trial court correctly treated the PSC's determination regarding the adequacy of the EIS as a legal conclusion, even though it was denominated as an "Ultimate Finding of Fact" in the PSC decision and order. CUB frames the matter under review as a "legal inquiry: is this information adequate, i.e., does it fulfill the requirements of § 1.11, Stats.?"[7] CUB emphasizes the statutory directive that a reviewing court is to "separately treat . . . interpretations of law," § 227.57(3), STATS., and "set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law."

---

[6] Section 227.20, STATS., as referred to in *WED IV*, is a predecessor to the present § 227.57, STATS.

[7] Section 1.11(2), STATS., provides:

(2)   All agencies of the state shall:

(c)   Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality under P.L. 91–190, 42 USC 4331, by the responsible official on:

1.   The environmental impact of the proposed action;

2.   Any adverse environmental effects which cannot be avoided should the proposal be implemented;

3.   Alternatives to the proposed action;

4.   The relationship between local short-term uses of the human environment and the maintenance and enhancement of long-term productivity; and

5.   Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

6.   Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

545

Section 227.57(5). CUB finds support in *WED IV* from the sentence which immediately follows the passage previously quoted, and urges that it be adopted as the standard of review for a determination of EIS adequacy:

> Due weight must be given a particular agency's competence and expertise, sec. 227.20(10), and a reviewing court should not substitute its judgment for an agency's application of a particular statute to the found facts if a rational basis exists for the agency's interpretation and that interpretation does not conflict with the legislative history of the statute, prior case law, or constitutional prohibitions.

*WED IV*, 98 Wis. 2d at 694, 298 N.W.2d at 209–10 (citing *Pabst v. Department of Taxation*, 19 Wis. 2d 313, 323–24, 120 N.W.2d 77, 82 (1963)).

We concluded in *WED IV* that the proper standard of review "a court must use in reviewing an agency determination that an EIS was adequately prepared according to the dictates" of § 1.11, STATS., "should be that set forth in sec. 227.20," a predecessor to the present § 227.57, STATS. *Id.* at 690, 693, 298 N.W.2d at 208, 209. We did not, however, state explicitly whether we considered our review to be of an application of law or of a determination of fact. We upheld the PSC's conclusion that the EIS in that case need not quantify the "energy promotional potential" resulting from a proposed "time-of-day" electric rate structure. The PSC had determined there was no adequate methodology for such a projection. We concluded the PSC's determination was not "unreasonable." *Id.* at 694–95, 298 N.W.2d at 210. Similarly, we sustained the PSC's refusal to rely on the results of a particular study

546

concerning "the inability of time-differentiated rates to reduce system peak demand" because the agency found the study to be "inconsistent" and "suspect." On this issue, we stated that we could not conclude that the PSC's determination was "not supported by substantial evidence or is unreasonable." *Id.* at 695, 298 N.W.2d at 210. We also upheld the PSC's determination of EIS adequacy against several other challenges.[8]

Our express holding in *WED IV* (that what is now § 227.57, STATS., governs the review of an agency's determination of EIS adequacy) does not, by itself, fully resolve the question of the standard of review to be applied in this case. This is especially so since we employed varying terminology in reaching our conclusions regarding the specific challenges to the adequacy of the EIS considered in *WED IV*. The parties each advance colorable arguments as to why the challenges to the EIS adequacy determination here are similar to or distinguishable from the challenges made in *WED IV*. They do likewise for the challenges to EIS adequacy considered in *Milwaukee Brewers Baseball Club v. DHSS*, 130 Wis. 2d 56, 70–75, 387 N.W.2d 245,

---

[8] On the alleged failure of the EIS to adequately discuss another impact of the proposed rate structure, we concluded that the discussion might not have been "exhaustive, [but] we cannot conclude that it was inadequate." *Wisconsin's Envtl. Decade, Inc. v. PSC*, 98 Wis. 2d 682, 696, 298 N.W.2d 205, 210 (Ct. App. 1980). On a claim that the discussion of alternatives to the proposed rate structure in the EIS was inadequate, we found the discussion of alternatives to be "extensiv[e]" and the PSC's choice of the differential rate structure to be a matter of "agency discretion," which it had not abused. *Id.*, 298 N.W.2d at 210–11. Finally, on a claim that the EIS failed to adequately discuss the "general environmental impacts" of the proposal, we simply noted that such a discussion "would be speculative and premature." *Id.* at 696–97, 298 N.W.2d at 211.

547

251–53 (1986). There, the supreme court differentiated between certain challenges to the EIS it deemed to be based upon "disputed issues of material fact" and those it found to "present questions of law." *Id.* at 71, 387 N.W.2d at 251. Unfortunately, the peculiar statutory underpinnings of the proposed project in that case (a prison in Milwaukee's Menomonee Valley) produces little guidance to us here. Moreover, the opinion is silent as to the standard to be applied when reviewing an agency's determination that an EIS is adequate.[9]

In *WED IV*, we relied on the supreme court's discussion in *Pabst v. Department of Taxation*, 19 Wis. 2d 313, 120 N.W.2d 77 (1963), for guidance on the appropriate standard by which to review a PSC determination of EIS adequacy. *See WED IV*, 98 Wis. 2d at 694, 298 N.W.2d at 209–10. We therefore believe it appropriate to again review *Pabst* for guidance here:

> In 4 Davis, Administrative Law Treatise, ch. 30, p. 189 *et seq.*, Professor Davis points out that the United States supreme court employs two conflicting methods of administrative review where the issue is whether the administrative agency has correctly applied a statute to certain facts. The first is the so-called analytical approach whereby the court decides which part of the agency's determination presents a question of fact and which part a question of law. The second is the practical or

---

[9] The *Brewers* court remanded the disputed factual issues for contested case proceedings. It then proceeded directly to a resolution of the conflict between the statute authorizing the project and § 1.11, STATS., ultimately "concur[ring] with the Department's conclusion that the legislature intended it to conduct an environmental review solely on the Menomonee Valley site." *Milwaukee Brewers Baseball Club v. DHSS*, 130 Wis. 2d 56, 71, 75, 387 N.W.2d 245, 251, 253 (1986).

policy approach which tries to avoid allocation of functions merely on the literal meaning of the terms "fact" and "law." When this practical approach is used, the court holds that, " 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' "

. . . .

[Professor Davis] concludes that the court applies the analytical approach when it does not wish to be bound by the agency's application of a statute to a set of facts, and the practical approach when it believes the agency's application of the law should be deferred to. Davis believes that one of the most-important factors which influences the court's choice of approach in this field is the comparative qualification of court and agency to decide the particular issue. The court often deems agencies and their staffs to be expert within their own specialized fields. In such situations, the practical approach is likely to be employed rather than the analytical in determining the scope of review to be applied.

We believe that pars. (b) and (d) of sec. 227.20 (1), Stats., require Wisconsin courts to employ the analytical approach when reviewing agency decisions. Nevertheless, in fields in which an agency has particular competence or expertise, the courts should not substitute their judgment for the agency's application of a particular statute to the found facts if a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions.

*Pabst,* 19 Wis. 2d at 322–24, 120 N.W.2d at 82 (footnotes and quoted sources omitted).

549

We are not bound by an agency's characterization of whether it is finding a fact or making a conclusion of law. *Connecticut Gen. Life Ins. Co. v. DILHR*, 86 Wis. 2d 393, 405, 273 N.W.2d 206, 211 (1979) ("[A] mislabeled finding will be treated by the reviewing court as what it is rather than as what it is called."). Our citation in *WED IV*, 98 Wis. 2d at 694, 298 N.W.2d at 209–10, to the last sentence of the foregoing passage from *Pabst*, 19 Wis. 2d at 324, 120 N.W.2d at 82, shows that we deemed our review of the EIS adequacy determination to be, at least in part, a review of "the agency's application of a particular statute to the found facts," not a review of an agency's factual findings. Further, we implicitly recognized the PSC's "particular competence or expertise" in determining whether an EIS complies with § 1.11, STATS. Accordingly, in *WED IV* we applied a standard which focuses on whether the agency's determination had a rational basis, having concluded that the supreme court in *Pabst* had sanctioned a variation on Professor Davis' "practical or policy approach" in appropriate cases, notwithstanding a statutory directive to employ a more "analytical approach." *See* § 227.57(3), STATS.

In the years since *Pabst*, the "practical or policy approach" to reviewing agency applications or interpretations of law in certain circumstances has evolved into "great weight" deference, the most deferential of three levels of deference which Wisconsin courts accord to agency conclusions of law and statutory interpretation. *See Jicha v. DILHR*, 169 Wis. 2d 284, 290–91, 485 N.W.2d 256, 258–59 (1992) ("First, if the administrative agency's experience, technical competence, and specialized knowledge aid the agency

in its interpretation and application of the statute, the agency determination is entitled to 'great weight' ") (quoted source omitted). More recently, the supreme court has enunciated four requirements for an agency's interpretation of a statute to be entitled to great weight: (1) the agency is charged by the legislature with the duty of administering the statute; (2) the interpretation of the agency is one of long-standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 660, 539 N.W.2d 98, 102 (1995).

The PSC's determination of EIS adequacy satisfies the first requirement because "[a]ll agencies of the state" must prepare an EIS under § 1.11, STATS., when acting upon a matter that "significantly affect[s] the quality of the human environment." The third requirement also presents little difficulty, in that we implicitly recognized in *WED IV* that the PSC has expertise and specialized knowledge of the technical matters concerned in the evaluation of an EIS related to an application pending before it. We can conceive of few matters in which the test of "comparative qualification of court and agency to decide the particular issue," *Pabst,* 19 Wis. 2d at 323, 120 N.W.2d at 82, tips more heavily in favor of the agency than does a determination of the adequacy of an EIS relating to the construction of a spent fuel storage facility for a nuclear power plant.

The second and fourth requirements are more difficult to apply in the present context, but we conclude they are also met. Although the PSC's determination of "adequacy" for the present EIS is

unique to this case, the agency's practice and methods of evaluating an EIS are long-standing, originating with the enactment of § 1.11, STATS., in 1971. *See* WIS. ADM. CODE § PSC 4.05–4.80 (Environmental Analysis). And, by according great weight deference to PSC determinations of EIS adequacy, we promote greater uniformity and consistency in the future than if we were to accord a lesser level of deference that would invite ad hoc court determinations of adequacy.

■

Finally, although not one of the four requirements for great weight deference, we have held that "where a legal question is intertwined with factual, value or public policy determinations, courts will defer to the agency whose responsibility it is to make those determinations." *See Wisconsin Power & Light Co. v. PSC*, 148 Wis. 2d 881, 887–88, 437 N.W.2d 888, 891 (Ct. App. 1989) (citing *West Bend Educ. Ass'n v. WERC*, 121 Wis. 2d 1, 12, 357 N.W.2d 534, 539–40 (1984)). As our analysis in *WED IV* and that which follows demonstrate, the PSC's evaluation of the adequacy of an EIS relating to a pending application is very much intertwined with the PSC's fact-finding and public policy-making responsibilities.

In summary, we conclude that the PSC's determination that the EIS is adequate represents its conclusion that the requirements of § 1.11, STATS., have been met on the facts before it with respect to the application under consideration. It is thus an application or interpretation of law, reviewable under § 227.57(5), STATS., and entitled to great weight deference from a reviewing court. The PSC's determination of EIS adequacy will be sustained if it is "merely . . . reasonable," and the burden of proof is on CUB to show that the PSC's determination of adequacy

is unreasonable. *See Harnischfeger Corp.,* 196 Wis. 2d at 661, 539 N.W.2d at 102. An interpretation is unreasonable only if it directly contravenes the words of a statute, if it is clearly contrary to legislative intent or it is without a rational basis. *Id.* at 662, 539 N.W.2d at 103.

The EIS in question addresses the various matters required by § 1.11(2)(c)1–6, STATS. (environmental impact of proposed project, unavoidable adverse environmental effects, alternatives to the proposal, short-term versus long-term implications, resource commitments involved, and economic advantages and disadvantages). CUB argues, however, that the EIS is inadequate in two regards: first, because it fails to consider a "reasonable range of duration scenarios" for the operation of the ISFSI, and second, because it fails to adequately discuss alternative sources of power instead of just alternatives for storing spent fuel. The challenge to the PSC's determination of EIS adequacy does not appear to be a claim that it "directly contravenes the words" of § 1.11, or even that the determination is "clearly contrary to the legislative intent" of that statute. Rather, CUB's challenge is more that the determination of adequacy lacks a rational basis because the EIS does not "go far enough" in addressing two matters required by § 1.11.

We therefore will sustain the PSC's determination of adequacy unless CUB persuades us that there is no rational basis for that determination. As we will discuss, we conclude that CUB has not met its burden. Since we accord the PSC's determination great weight deference, it is not our role to consider whether we would conclude that the EIS in this case adequately meets the requirements of § 1.11, STATS., or even whether a conclusion that it does not do so would be

553

equally reasonable on the record before us. *See Cadott Educ. Ass'n v. WERC,* 197 Wis. 2d 46, 53, 540 N.W.2d 21, 24 (Ct. App. 1995); *Shoreline Park Preservation, Inc. v. DOA,* 195 Wis. 2d 750, 761–62, 537 N.W.2d 388, 392 (Ct. App. 1995).

### b.  Duration Scenarios in the EIS

No matter how exhaustive the discussion of environmental impacts in a particular EIS might be, a challenger can always point to a potentiality that was not addressed. Apparently mindful of this, CUB primarily argues that the EIS fails to adequately discuss the impacts of the ISFSI for two possibilities: (1) the duration scenario which CUB claims the PSC found to be most likely, non-removal of spent fuel by the DOE until after 2023; and (2) the worst case possibility that DOE will never take the nuclear wastes. In support of its argument, CUB cites *Potomac Alliance v. United States Nuclear Regulatory Comm'n,* 682 F.2d 1030 (D.C. Cir. 1982), for the proposition that "an agency's goal must be to trace each reasonably foreseeable contingency and determine, first, the likelihood of its occurring, and second, the environmental damage that would result should it occur."[10] *Id.* at 1037.

The EIS analyzes the number of casks that would be needed under differing assumptions for the operational duration of the two Point Beach units and for possible commencement dates of DOE spent fuel

---

[10] Wisconsin courts may look to federal cases interpreting the National Environmental Protection Act for guidance in interpreting § 1.11, STATS., Wisconsin's Environmental Protection Act. *Larsen v. Munz Corp.,* 167 Wis. 2d 583, 606, 482 N.W.2d 332, 342 (1992).

removal. The latest date for the commencement of DOE spent fuel removal used in the projections is 2015. Tables in the EIS provide projections for annual occupational and general public radiation exposure for 48 casks and 103 casks, the latter number being the maximum number of casks on site if the units are operated to the end of their licenses and the plant is decommissioned, all before DOE starts taking any spent fuel. The EIS states that "[n]o one knows how long the proposed dry cask spent fuel storage facility would be used on the Point Beach site. . . . It would be pure speculation at this point to predict [when DOE will begin taking fuel]." And, the potential "permanence" of the ISFSI is also recognized in the EIS:

> If the Federal government continues to fail to develop a long-term spent fuel solution, there will be a need to determine the best method for continued storage of the spent fuel at Point Beach. That determination, however, would occur in the future and it would be speculation at this point to consider what options would be likely. The decision currently before the Commission, the approval of the proposed dry cask spent fuel storage facility is not likely to have any significant effect on a possible future decision about continued long-term storage at Point Beach.

The PSC decision and order notes that "information is given [in the EIS] which allows extrapolation of the effects of more casks, to cover the possibility of using casks to provide all the storage for all the spent fuel generated at Point Beach from start up to end of licenses." The PSC's factual findings include the following:

8. It is unlikely that the DOE will have a *permanent* spent fuel repository in operation before the year 2023. *When or whether DOE will begin taking spent nuclear fuel is a matter of speculation.*

. . . .

12. Licensed *temporary* storage for spent nuclear fuel away from the Point Beach site, other than facilities operated by the DOE which are not accepting spent fuel from commercial reactors in the United States, is not currently available. *Temporary off-site storage may become available in the future, through arrangements with an independent contractor, or through actions of the DOE.*

(Emphasis supplied.)

Thus, we concur with the PSC and WEPCO that the PSC did not find the year 2023 to be any more or less likely for the commencement of DOE spent fuel removal than any other date for removal to at least a temporary off-site storage facility. The analysis and discussion in the EIS acknowledge the speculative nature of any conclusions in this regard, and the EIS provides data and analysis for the evaluation of impacts for the ISFSI for a reasonable range of scenarios. Section 1.11, STATS., does not require an agency to "engage in remote and speculative analysis," but it must take a "hard look" at the environmental consequences of its proposed action. *WED IV*, 98 Wis. 2d at 690, 298 N.W.2d at 207–08. We conclude that the PSC has done so in this case, and that its factual findings provide a rational basis for its determination that the EIS was adequate.

■

CUB also argues that the PSC ignored the testimony of several witnesses in concluding that the

amount of spent fuel that accumulates in the proposed ISFSI in the coming years would not significantly alter the environmental and other impacts from the facility. As a result, CUB claims there is an inadequate discussion in the EIS of the likely impacts of the ISFSI. As CUB itself concedes, however, there was also testimony to the effect that:

> Whether the actual commencement of spent fuel removal from Point Beach begins in the year 1998, 2010, 2015, or beyond, there will be no effect on safety and no significant difference in the environmental impacts of such extended temporary storage or the generation of additional spent fuel. Even if the quantity of stored spent fuel were to double, the environmental impacts would not be significantly altered.

To the extent that CUB's argument goes beyond a challenge to the PSC's determination of EIS adequacy and becomes an attack on the factual findings made in the PSC order or in the EIS itself, we conclude that there was substantial evidence to support those findings. We cannot substitute our judgment for that of the agency regarding the weight of the evidence supporting any disputed finding of fact. Section 227.57(6), STATS.; *see WED IV*, 98 Wis. 2d at 693–94, 298 N.W.2d at 209–10.

### c. Discussion of Alternatives to the ISFSI

CUB claims that the PSC could not properly conclude the EIS was adequate because the EIS treatment of the "no action alternative" was deficient. Specifically, CUB argues that the EIS did not adequately consider "alternative sources of power" if Point Beach were to shut down in 1998. The EIS

recognizes that a decision to not authorize the proposed dry cask ISFSI would result in a 1998 shutdown of both units at Point Beach, with a resulting need to replace its electric generating capacity:

> The energy generated by the Point Beach units would be replaced by a combination of purchased power, energy efficiency and conservation (Demand Side Measures), renewable sources of energy, cogeneration, repowering existing power plants and construction of new power plants.

The EIS briefly discusses the impacts of a newly constructed coal-burning plant, but notes that construction and operation impacts would depend on the specific site chosen and would be "evaluated thoroughly" during "DNR and PSC construction review and permitting." Some additional analysis is devoted to the possible conversion of the Point Beach site itself to a coal-burning plant, noting however, that this would result in interference with decommissioning of the existing nuclear generating units. The EIS acknowledges that the discussion of these alternatives is "general," and that "it is not possible to predict the type and site of power plants that would replace Point Beach."

The PSC found in its decision and order that "[w]hether or not Point Beach continues to operate, additional storage space for the fuel now in the two reactors and existing spent fuel will be required, in addition to the existing spent fuel pool."[11] The PSC

---

[11] The trial court concurred in this finding, noting in its memorandum decision and order that "as a practical matter, 12 casks may be immediately necessary as a form of essential storage to meet immediate needs, irrespective of future plant operation."

concluded that the "choice is *not whether* to store spent fuel on the site, *but how* to continue to store spent fuel on the site." The PSC also noted, correctly, that the EIS analyzed currently available dry cask designs and a "conceptual multipurpose cask," as well as a possible second fuel storage pool, off-site temporary storage, and the aforementioned "no action" alternative, "which includes the effects of discontinuing operation of the plant."

We believe that it is significant that the PSC order approving WEPCO's application authorizes only twelve casks, a number the PSC found necessary regardless of the operation of Point Beach as a nuclear facility beyond 1998. The PSC stated that its limited approval was to preserve flexibility in light of the uncertainties regarding DOE fuel removal activities:

> In this case, the Commission's authorization of 12 casks reflects its choice of the most flexible option available to address the uncertainties of whether and when DOE will take the spent fuel. If DOE fulfills its obligation in 1998, 12 casks will handle the storage requirements. If not, the choice whether to go forward can be reviewed in light of circumstances existing at that time, without WEP CO having committed to a major, inflexible capital outlay, such as building a second pool.

We conclude that there is a rational basis for the PSC's determination that the consideration of alternatives to the proposed ISFSI in the EIS was adequate, given its finding that some type of storage in addition to the existing pool was necessary now, regardless of the duration of future nuclear generation at Point Beach. The question to be decided by the PSC was not whether Point Beach should or should not be allowed to operate beyond 1998, although it recognized

that a denial of the ISFSI application (the "no action alternative") would have the effect of requiring a 1998 shutdown of both units. The EIS lists the potential alternatives for replacing Point Beach's generating capacity, and it discusses one likely alternative, a coal-burning generating plant. Additional discussion in the EIS of alternative sources of electric power would have been premised on speculation and uncertainties, and hence would have contributed little to the PSC's decision-making regarding the application before it. In light of those uncertainties, the PSC rationally chose to limit its approval to what it found was reasonably necessary to meet present spent fuel storage needs at Point Beach. *See J.F. Ahern Co. v. Building Comm'n,* 114 Wis. 2d 69, 96, 336 N.W.2d 679, 692 (Ct. App. 1983) ("Rational choices can be made in a process which considers opinions and predictions based on experience.").

■

Because we conclude there was a rational basis for the PSC's determination that the EIS prepared for the proposed ISFSI was adequate, we reverse the circuit court's order and remand for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded.